**In re AMHERST SPARKLE MARKET, INC., Debtor.**

**Bankruptcy No. B87–0064.**

United States Bankruptcy Court, N.D. Ohio, E.D.

July 8, 1987.

Thomas A. McCormack, Cleveland, Ohio, for debtor, debtor-in-possession.

Mark A. Rock, Schwarzwald, Robiner, Wolf & Rock, Cleveland, Ohio, for the Union.

MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

Amherst Sparkle Market, Inc. (Debtor) seeks the rejection of a collective bargain-

ing agreement (Contract) which it entered into with Local 880, United Food & Commercial Workers Union (the Union). Upon due notice to all parties entitled thereto, an evidentiary hearing was held in compliance with 11 U.S.C. § 1113. The Court, having heard testimony, examined all matters admitted into evidence, reviewed all pleadings and argument of counsel, renders the following findings pursuant to Rule 7052 of the Bankruptcy Rules:

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Herein, the Debtor seeks rejection of a contract entered into with the Union on June 1, 1985, which is due to expire on June 1, 1988. The Debtor, an independently operated retail grocery business, employs fifty-one (51) union employees and three (3) nonunion employees, and has been affiliated with the Union since 1974. In the Debtor's efforts to pursue rejection of the contract, the following chronology of pre-application activity is relevant:

—Debtor experienced operating losses in 1985 and 1986;

—January 9, 1987: Debtor filed its petition for relief under Chapter 11;

—January 28, 1987: Debtor submitted its concessions proposal to Union;

—February 9, 1987: Parties met to discuss Debtor's proposal;

—February 25, 1987: Parties met to discuss Debtor's proposal;

—April 3, 1987: Union submitted its counterproposal to Debtor;

—April 16, 1987: Debtor filed its motion to reject contract;

—April 20, 1987: Union received additional data from the Debtor;

—May 1, 1987: Debtor responded to Union's counterproposal.

On May 4, 1987 the Court initially heard the Debtor's motion to implement interim changes and to reject the contract. The request for implementation for interim changes was duly heard and denied. Before the Court recommenced the hearing to determine whether the contract should be rejected under 11 U.S.C. § 1113(c), the parties requested an adjournment of the hearing to allow them to negotiate a compromise. Those efforts, reportedly, were not successful and the hearing reconvened and concluded on June 10, 1987.

## II.

In determining whether a collective bargaining agreement should be rejected upon motion by a debtor corporation, the Court must insure full compliance with the requirements of § 1113 of the Code [11 U.S.C. § 1113]. Therein, we find that, beyond the time requirements set forth in § 1113(d)(1) and (2), certain prerequisites must be accomplished under § 1113(b)(1) and (2) before rejection may be achieved under § 1113(c). This statutory scheme codifies an endorsed equitable standard for rejection which emanated from the U.S. Supreme Court's decision in *N.L.R.B. v. Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

11 USCS § 1113. Rejection of collective bargaining agreements

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this Chapter [11 USCS §§ 1101 et seq.], other than a trustee in a case covered by subchapter IV of this chapter [11 USCS §§ 1161 et seq.] and by title I of the Railway Labor Act [45 USCS §§ 151 et seq.], may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debt-

or and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

The requirements of § 1113(b)(1), (c) are usually examined in the form of the following nine-test format which this Court hereby adopts:

1. The debtor must make a proposal to the union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor, and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement. (*See, In re American Provision Co.*, 44 B.R. 907 (Bankr.D.Minn.1984)).

■ With regard to each of the above tests, the burden of proof is to be borne by the debtor; however, the burden of going forward with the evidence can shift to the union, particularly as it concerns tests number five, seven and eight, above. *American Provision Co.*, *supra*, at 909. The debtor's burden respecting each of the nine elements is to be satisfied by a preponderance of the evidence. *In re Walway Co.*, 69 B.R. 967 (Bankr.E.D.Mich.1987), *citing, American Provision Co.*, *supra*.

### III.

In view of the foregoing statutory requirements, the principal issue before the Court is whether the Debtor has proved by a preponderance of the evidence that it is entitled to reject the Contract pursuant to § 1113. In resolving this issue, the Debtor's prepetition history is relevant and should be addressed prior to an application of the nine-test format. *Inter alia*, the record reflects the Debtor has been in business thirty years. It sustained operational losses in fiscal years 1985 and 1986, after reaping a profit of $11,000.00 in fiscal year 1984 (TR. 6, Hrg. 5–4–87). Remarkably, those recent losses were experienced while the Debtor's gross sales in the past three-year period increased, with gross sales in 1986 being the best since 1980 (TR. 109, Hrg. 5–5–87).

The record further reflects that the Debtor sought and received concessions from the Union as early as 1984. (TR. 22, Hrg. 6–10–87). Again, in the fall of 1986,

the Debtor unsuccessfully sought Union concessions. (*Id.; TR.* 32–33). In view of this prepetition history, the nine-test format referable to § 1113 is hereby applied:

Test # 1: Debtor's Proposal To Modify The Contract.

This initial prong of the nine-test format was adequately addressed by the Debtor. The record reflects that the Debtor caused its written proposal to be submitted to the Union on January 28, 1987, which addressed a ten-point concession package (Debtor's Ex. # 3), inclusive of (1) a ten percent reduction in rate for four specified positions; (2) a reduction to $7.30/hour wage level for three specified positions; (3) a reduction of the clerk/cashier rate to $5.00/hr. for all personnel with two or more years of service; (4) reduction of clerk/cashier rate for personnel with less than two years of service to entry level or $4.00/hr.; (5) reduction to one week of vacation for all personnel; (6) reduction of paid holidays to six; (7) no changes in benefits (i.e., pension, health and welfare); (8) recognition that employees deemed "part-time" would have no established work week; (9) removal of the "thirty-hour, four week" clause in the current contract; and (10) deletion of all premium pay. Receipt of this proposal by the Union is undisputed, and therefore comports with test number 1, and § 1113(b)(1), which requires a proposal be made to the Union's authorized representative.

Test # 2: Reliability and Completeness of Proposal.

Contrary to the Union's contention, the Debtor's proposal contained the most complete and reliable information available at the time of the proposal. A proposal, in order to contain complete and reliable information, does not necessarily have to be error-free. This is particularly so where errors, if any, were made inadvertently and relevant corrective data was seasonably provided to the Union. By letter, Debtor's proposal was submitted to the Union on January 28, 1987. Significantly, it was not until April 3, 1987 that the Union submitted a formal written response in the form of a counterproposal. An earlier Union response to the Debtor's proposal would have provided greater indicia of a meaningful and more willing Union participation in post-petition negotiation. Such was lacking here. In view of two meetings engaged between Debtor and the Union on February 9 and 25, 1987, the record is silent to show where additional documentation was requested but not received by the Union, other than unsupported and disputed testimony of its business agent (TR. 38–41, Hrg. 6–10–87). The more persuasive and supported testimony of Debtor's store manager, Ron Stoyanoff, revealed Debtor's willingness to promptly provide the Union with any desired additional data (Debtor's Ex. # 3), and further provide the Union with evaluative data (Ex. # 4), and offered assistance interpreting it (TR. 10, Hrg. 60–10–87). He also provided the Union with the Debtor's profit and loss report and balance sheet for the previous fiscal year, cash disbursement data, Debtor's general ledger and payroll registers. The testimony of Stoyanoff further revealed that the information contained in Debtor's Ex. # 4, that was provided to the Union pre-hearing, contained projections based upon fiscal year 1986 performance. As a consequence of the two meetings held by the parties hereto, certain errors were noted in Debtor's Ex. # 4. Debtor acknowledged and caused corrective data to be provided to the Union, post-application, which constitutes Debtor's Ex. # 5. It is unchallenged that the financial data provided the Union was unaudited; however, such is not fatal in the instance of a financially distressed debtor corporation which provides the Union with supportive documentation for its current and projected financial posture. The Union mistakenly finds solace in its comment that Debtor's corrective data (Ex. # 5) was provided four days after Debtor sought rejection. More importantly, both Debtor's Ex. # 3 and Union's Ex. C clearly point out that the data contained therein was based on financial data previously made available to the Union. Thusly, the proposal of Debtor was based upon the most complete and reliable information available when given.

Test # 3: Proposed Modifications Necessary To Debtor's Reorganization.

■ This test requires that the proposed modifications be necessary to permit the reorganization of the debtor. Although some degree of controversy has arisen regarding the construction of "necessary," we are comfortably constrained to continue our interpretation of "necessary" as meaning something less than "essential," in construing § 1113(b)(1)(A). *See, Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82 (2nd Cir.1987); *In re Allied Delivery System Co.*, 49 B.R. 700, 702 (Bankr.N.D.Ohio 1985); *Contra, In re Wheeling-Pittsburgh Steel*, 791 F.2d 1074, 1088 (3rd Cir.1986); *But See, In re Royal Composing Room, Inc.*, 62 B.R. 403, 417–18 (Bankr.S.D.N.Y.1986). The continuing rationale for this interpretation of "necessary" is found in the statutory mandate requiring a debtor to negotiate in good faith over the proposed modifications; and if that debtor-employer initially proposed bare minimum changes, such a debtor would forfeit its bargaining posture for good faith negotiating, while one who agreed to any substantive changes would have much difficulty proving that its initial proposals were minimal. *Truck Drivers v. Carey Transp., supra,* at 89, *citing, In re Allied Delivery System, supra*. Moreover, the legislative history is strongly suggestive that "necessary" should not be equated with "essential" or bare minimum. *Id.,* (P.L. 98–353, Title III, Subtitle J, § 541(a), 98 Stat. 390); 130 Cong.Rec. S8898 (June 29, 1984); 130 Cong.Rec.H. 7496 (June 29, 1984).

Record evidence adduced by the Debtor reveals that its labor costs are 13.08% of sales, compared to a comparable average market of 8.6% wage expense. (Debtor's Ex. # 1). This was not disputed. Debtor's proposal (Ex. # 3) indicated that its deficit was increasing on a monthly basis in excess of $12,000.00. This, too, was undisputed. Furthermore, Debtor's projections set forth in Ex. # 4 and Ex. # 5 provided estimated savings to address the rising deficit. Those projections were based on evaluative data previously made available to the Union. (*See,* Debtor's Ex. # 3 and Union's Ex. C). Further, the Union's Ex. E provided additional support for the necessity of the proposed modifications. Therein the Debtor directed the Union's attention to its Chapter 11 monthly operating reports which revealed successive operating losses post-petition, without consideration of a depreciation factor. Of significant interest, Ex. E, a letter from the Debtor to the Union, was exhibited by the Union, but the Union offered no documentary or other evidence to refute its substance. In summary, the Union has not gone forward with sufficient evidence to refute the Debtor's proposed modifications as being necessary to the Debtor's reorganization. The Debtor has met its burden. Although not a requirement under § 1113(b)(1)(A), the Debtor's letter exhibited as Union's Ex. E suggested the framework of a "snap-back" procedure as an accommodation to the Union. The conclusion reached by the Court regarding this test is premised not so much on the Debtor's short-term viability, but rather, is premised with a view towards the Debtor's ultimate ability to reorganize its financial structure and emerge from Chapter 11 as a rehabilitated entity. *Truck Drivers Local v. Carey Transp., supra,* 816 F.2d at 90. Thusly, the modifications, as proposed, are necessary to permit the Debtor's reorganization, and the Union understood a need for concessions. (TR. 43, L. 14, 6–10–87 Hrg.).

Test # 4: Fair And Equitable Treatment Of All Parties.

■ Contrary to the Union's assertions, all affected parties are accorded fair and equitable treatment by the proposed modifications. Simply because the proposed modifications do not provide for identical treatment with respect to all affected parties, this does not necessarily result in unfair or inequitable treatment under § 1113(b)(1)(A). *See, In re Allied Delivery System Co., supra,* 49 B.R. at 703. A "debtor is not required to prove in all instances that managers and nonunion employees will have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced." *See, also, Carey, supra,* 816 F.2d at 90. At bar, the proposed

treatment between union versus nonunion employees, in fact, is not identical; however such treatment is not inequitable or unfair in view of the Debtor's total situation. Although the relative treatment is not identical, any savings realized by reason of the proposal would be escrowed. The Debtor was amenable to implementation of a snap-back provision (Ex. E: "... to establish operating benchmarks for restoration of lost wages and benefits under the collective bargaining agreement.") Moreover, the hourly salaries received by one of the three nonunion employees, on comparison, is less than the contract scale paid to similar union employees. An example can be found in the unrefuted testimony reflecting a $7.50 hourly wage received by one nonunion employee, who works in excess of a 40–hour week. That individual would earn $9.00 plus per hour if she were a union employee.[1] Further, particular notice is given to the fact that the subject proposal does not call for adjustments in health and welfare or pension entitlements of Union employees. To the extent the Union contests dissimilar treatment accorded to the three nonunion co-owners, Exhibits # 4 and # 5 clearly reveal that the nonunion employees are virtually the only employees who work in excess of a forty-hour week.[2] On balance, these same exhibits reveal that the majority of the 51 Union employees work substantially less than a forty-hour week. Further, the Union's assertion that additional concessions can be achieved by certain reductions in the Debtor's lease is without merit. The requirement of Section 1113(b)(1)(A) that all creditors be treated fairly and equitably does not mean that a creditor who is also an owner of the debtor must take a smaller percentage dividend than other creditors. *See, Carey, supra,* at 91; *In re Kentucky Truck Sales,* 52 B.R. 797, 803, 804 (Bankr.W.D.Ky.1985). The proposed treatment is fair and equitable.

Test # 5: The Requirement For Relevant And Necessary Information For Evaluation.

Although the Union contends otherwise, the Debtor provided the Union with relevant information which was necessary for the Union to evaluate its proposal. Significantly, this test is solely applicable to a debtor's proposal and not to a corresponding counterproposal which may be submitted by the Union. Not only did the Debtor submit a proposal in compliance with § 1113(b)(1)(A), it offered assistance to the Union regarding any interpretation of same. *See,* Ex. 3. Further, the Debtor engaged in two meetings with the Union, post-submission, where it provided both additional and corrective data on a continuing basis (TR. 4, 5, 9 and 10, Hrg. 6–10–87). The documentation provided was substantial, relevant and necessary to the Union's evaluation of the proposal. *See,* § 1113(b)(1)(B).

Test # 6: Requirement For Pre-Hearing Meetings.

The record clearly indicates that after submission of its proposal to the Union, the Debtor and the Union met on two occasions (February 9 and 25, 1987) prior to the initial hearing on the motion to reject the Contract. (TR. 10, 39–43, Hrg. 6–10–87). Additionally, the record evidence reflects various other written communications exchanged by the parties during this subject period. No dispute is demonstrated from the record concerning the reasonableness of the meeting times. This requirement under § 1113(b)(1)(A) has been satisfied.

Test # 7: Good Faith Requirement.

After submission of its proposal, the Debtor met with the Union, and provided requisite data for proposal evaluation. This standard requires the Debtor, after submission of its proposal and before the hearing on rejection, to meet with the Union in a good faith effort to achieve a resolution. *See, American Provision, su-*

---

**1.** Mrs. Stoyanoff (produce manager) and her two sons, Rick (assistant manager) and Ron (store manager), comprise the Debtor's three nonunion employees. These individuals are also co-owners of the Debtor.

**2.** The Union wanted identical treatment for both union and nonunion personnel. *See,* Union's Ex. A.

*pra,* at 907. Herein, there has been no demonstration of lack of good faith, and the Court so finds.

Test #8: "Good Cause" Requirement.

This standard requires a determination to discern whether the Union refused to accept the proposal without good cause. This determination is to be made utilizing an objective standard. *See, In re Salt Creek Freightways,* 47 B.R. 835 (Bankr.D. Wyo.1985). Herein, the Union's rejection of the proposed modifications was without good cause. As stated above, the record evidence adequately demonstrates that the Debtor had sustained severe and successive operating losses both prepetition and post-petition. This occurred even with prior prepetition concessions provided by the Union in an effort to insure the Debtor's viability. The Union understood that the Debtor would not survive financially unless it received a certain level of concessions (TR. 43, 44, Hrg. 6–10–87; *See also* Ex. A). Post-petition monthly operating reports of the Debtor filed in this Chapter 11 proceeding further reflect that the Debtor continues to operate unprofitably. The Union has failed to adduce evidence sufficient to controvert the financially distressed position demonstrated by the Debtor. The Union's response to the Debtor's January 28, 1987 proposal was submitted on April 3, 1987. In view of the severity of the Debtor's continuing losses, such a delay in response was unwarranted. Especially is this significant when the Union acknowledged that concession negotiations were ongoing at the time the Debtor filed its Chapter 11 petition on January 9, 1987. *See,* Union's Ex. A. Accordingly, the rejection of the proposal was without good cause pursuant to § 1113(c)(2).

Test #9: Balance Of The Equities.

Finally, the balance of the equities must clearly favor rejection of the collective bargaining agreement. This requirement of § 1113(c)(3) constitutes a codification of the equitable standard articulated under the *Bildisco* decision, and directs the Court's attention to the principal focus of a Chapter 11 proceeding—the rehabilitation of a financially distressed business entity. Ac-cordingly, the record evidence presents a financially distressed business debtor which has experienced operating losses for a substantial period of time. Unquestionably, the prepetition concessions sought and obtained by the Debtor were inadequate to keep it financially viable. The post-petition concessions sought by the Debtor were described as "minimum" concessions needed to allow it to continue operating. Unrefuted record testimony further indicates the Debtor has only a minimal amount of cash on hand; is presently on a one-week billing basis with its wholesale supplier, which also possesses a secured interest in virtually all of the Debtor's cash collateral; Debtor is on a cash-on-delivery basis only with its creditors; Debtor is restricted to a seven-day billing arrangement with its wholesale supplier; Debtor's efforts to improve its credit arrangements have been unsuccessful; and finally, Debtor's several cost-cutting measures to date have not proved adequate to staunch its continuing operating losses. In the face of this dire financial predicament, the Union has not come forward with sufficient economic evidence or testimony to controvert the Debtor's financial status. Thusly, it becomes clear that the equities, on balance, favor rejection of the Contract to allow the Debtor to make further attempts to reorganize its financial structure, and we so find.

### CONCLUSION

The nine-point test enunciated in *American Provision, supra,* fully comports with the procedural and substantive standards to be met under § 1113(b)(1) and (2) and § 1113(c), and the Debtor has fully satisfied each requirement. Accordingly, pursuant to § 1113(d)(2), Debtor's motion to reject the collective bargaining agreement with the Union is granted.

IT IS SO ORDERED.