**In re GAROFALO'S FINER FOODS, INCORPORATED, Debtor.**

**Bankruptcy No. 90 B 08112.**

United States Bankruptcy Court, N.D. Illinois, E.D.

July 27, 1990.

Cynthia G. Swiger, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for Debtor, Garofalo's Finer Foods, Inc.

Jonathan D. Karmel, Rosenfeld & Karmel, Chicago, Ill., for United Food & Commercial Workers Union Local 546, 881 & 1540.

F. John McGinnis, Altheimer & Gray, Chicago, Ill., for Scot Lad Foods, Inc. and Midland Grocery Co.

Edward J. Halper, Levenfeld, Eisenberg, Janger Glassberg, Samotny & Halper, Chicago, Ill., for Beverly Bank Matteson.

Dean C. Harvalis, Office of the U.S. Trustee, Chicago, Ill., Representative of the U.S. Trustee.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion to assume modified collective bargaining agreements or, alternatively to reject the agreements, filed by Garofalo's Finer Foods, Incorporated (the "Debtor"). For the reasons set forth herein, pursuant to 11 U.S.C. § 1113(e), the Court hereby extends the July 16, 1990 Order for Interim Relief under its terms and conditions until August 28, 1990 for additional interim relief. The alternative relief sought of rejection of the agreements pursuant to 11 U.S.C. § 1113(a) and (c) will be allowed if the parties are unable to negotiate mutually satisfactory terms and conditions as outlined in this Opinion, by or before August 28, 1990, to be incorporated in the Debtor's plan of reorganization and disclosure statement.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334

and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. The motion made pursuant to 11 U.S.C. § 1113 appears to be a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). In the event the contested motion is deemed a noncore proceeding, the following constitutes recommended proposed findings of fact and conclusions of law.

## II. FACTS AND BACKGROUND

In July and August, 1988, the Debtor entered into certain collective bargaining agreements with three local unions for three-year terms, expiring in July and August, 1991. United Food and Commercial Workers Local 881 ("Local 881") represents approximately one hundred ten of the Debtor's employees who serve as retail clerks, including cashiers, service clerks and utility clerks at both of its two business locations. United Food and Commercial Workers Local 546 ("Local 546") represents approximately fourteen employees who serve as meat-cutters and deli-clerks at the Debtor's Chicago Heights, Illinois store. United Food and Commercial Workers Local 1540 ("Local 1540") represents approximately eight meat-cutters and deli-clerks at the Debtor's Park Forest, Illinois store. Only six employees are nonunion and they comprise the executive and administrative staff of the Debtor.

On May 2, 1990, the Debtor filed a voluntary Chapter 11 petition. The Court ordered the Debtor to file a plan of reorganization and disclosure statement by or before August 28, 1990. The Debtor has operated and managed its retail grocery business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Debtor owes its secured creditors, Midland Grocery Company, Scot Lad Foods, Inc. and the Beverly Bank Matteson in excess of $1.5 million in aggregate debts, which are secured by senior and junior perfected security interests in all the Debtor's inventory, equipment, and receivables. The Debtor scheduled priority debts in excess of $200,000.00 for sales taxes and other taxes. In addition, the Debtor scheduled over $40,-000.00 for unpaid contributions to employee benefit plans. Unsecured debts exceeded $1.5 million. The total amount of debt scheduled was approximately $3.38 million, with assets scheduled at approximately $2.49 million. The Debtor is operating under negotiated cash collateral orders with its secured lenders that have been approved by the Court after notice and hearing pursuant to 11 U.S.C. § 364(c) and Bankruptcy Rule 4001(b) and (d).

Between May 18 and May 29, 1990, the Debtor made separate but similar proposals to each Local to modify the existing collective bargaining agreements. The proposals were accompanied by certain financial information concerning the Debtor. On June 13, 1990, the Debtor filed the instant motion asserting that it is currently operating post-petition at a substantial deficit. The Debtor states that the proposed modifications to the collective bargaining agreements are necessary to permit its reorganization and assure that all creditors and other affected parties, including the Debtor, are treated fairly and equitably. Moreover, the Debtor suggests proposed wage and benefit modifications for all employees, not just the union employees. The Debtor proposes an overall decrease in employee wages and benefits by approximately twenty-seven percent from that compensation currently paid under the collective bargaining agreements. The Debtor further contends that its representatives have been available to meet with the Locals to discuss and negotiate the proposals, but that the Locals have not responded. The Debtor therefore concludes that a balancing of the equities favors the requested modifications of the collective bargaining agreements or alternatively, rejection thereof.

The Court commenced the evidentiary hearing on July 2, 1990, in accordance with the provisions of 11 U.S.C. § 1113(d)(1). The continued hearing was held on July 5, 12 and 16, 1990. Thereafter, closing arguments and authorities were submitted on July 18, 1990. In accordance with the requirements of section 1113(d)(2), the Court is timely ruling on the motion within thirty days after the initial date of the commencement of the hearing.

## III. EVIDENCE ADDUCED AT TRIAL

The Debtor offered the only testimonial and documentary evidence at trial. The principal witness for the Debtor was its president, Dominic Garofalo. The Debtor is a closely held family owned corporation, incorporated almost fifty years ago. At its peak, it operated nine stores in the Chicago Metropolitan Area, most of which have been sold over the past twelve years. The majority of its employees have been represented by the Locals since 1945. The Debtor has attempted to effectively compete by providing full service, a high degree of cleanliness and its long established good reputation in the market. The Debtor engages in niche marketing as a full service retail grocer, and seeks to maintain, if not increase, sales volumes in light of the increased competition. Prior store sales and closures have resulted in "bumping" of junior employees by more senior union employees who have opted to transfer to remaining stores operated by the Debtor, as an alternative to taking severance pay under the collective bargaining agreements. In recent years, the result of "bumping" has increased labor costs of the Debtor at its two remaining stores. The Debtor currently employs a substantial number of union employees who enjoy high seniority and attendant higher wages and fringe benefits which include health, welfare and pension benefits. The Debtor's current labor costs approximate an average of twelve and one-half percent of its gross sales, reduced from over thirteen percent in 1988 and 1989. The six nonunion employees have no pension or retirement benefits, but are covered by a nonunion insurance plan.

Although the Debtor made a profit of approximately $297,000.00 in 1988, it lost approximately $447,000.00 in 1989. Garofalo attributed the downturn in 1989, which continues into 1990, to a decrease in sales volume because of increased competition, coupled with an increased cost of doing business. The latter factor includes the higher union labor costs borne by the remaining stores as a result of the "bumping" of union employees from the closed or sold stores. From Garofalo's review of the industry trade journals, ten percent is the industry's average labor costs. The Debtor's remaining two stores compete with larger retail chain grocery outlets including a new entrant. At the time of trial, the Park Forest store was averaging only $111,000.00 in gross sales per week, but showed a net loss of approximately $4,000.00 per week, not including any debt service. The Chicago Heights store, at the time of trial, averaged $260,000.00 in gross sales per week, but was still losing approximately $1,800.00 per week, not including debt service.

According to Garofalo's testimony the Debtor's aggregate negative weekly cash flow of $5,800.00 needs to be offset to allow the company to break even before it can begin to service its outstanding pre-petition secured debt. Garofalo testified that an approximate $7,000.00 a week reduction of the Debtor's operational expenses would allow it to break even post-petition, and comply with its negotiated cash collateral financing. Debt service to the secured creditors and priority tax creditors would require an additional $7,000.00 per week. Accordingly, the Debtor needs an overall twenty-seven percent reduction in its labor costs.

Post-petition, the Debtor was recently extended somewhat favorable credit terms by several of its unsecured trade creditors. For the most part, however, the Debtor is on a C.O.D. or prepayment basis. Although Garofalo and his father are earning substantial annual salaries that have not been reduced as of July 2, 1990, he testified that all nonunion employees' compensation would soon be reduced. All other operational costs have already been reduced. There are no other areas for expense reductions except for employee compensation. In Garofalo's opinion, absent relief under section 1113, the Debtor is not likely to receive further extensions of credit by its secured creditors under the existing cash collateral orders. He further testified that based on operations pre-petition in 1990 and post-petition to date, the Debtor will have to liquidate if the instant collective bargaining agreements cannot be modified along the lines of the proposals.

The Debtor's proposals to modify were made to the three Locals in May, 1990. Thereafter, meetings were held on June 4 and 28, 1990, with representatives of the Locals. At that time, the Debtor's most current available financial information was furnished as requested. The three alternate proposals were tabled in order to avoid only one approach, and to afford the Locals several options to consider during negotiations. The Debtor's proposals eliminate certain provisions of the existing collective bargaining agreements in order to minimize the adverse economic impact from the result of "bumping." Hence, the proposals would eliminate those provisions dealing with seniority, layoff, recall and transfer rights, as well as other provisions dealing with some of the rights to severance pay, unused sick leave, vacation and holiday pay. The three alternative proposals all target total reduction in union labor costs at twenty-seven percent of the wage and fringe benefits. Under the first proposal, one-hundred percent of the compensation reduction would be taken out of employees' straight time hourly rates, on a sliding scale, so that employees' wages at the lower end of the wage scale would not be reduced below the existing federal minimum wage requirements. The second alternative proposal provides for the same targeted total reduction to be taken out of fringe benefits and straight time hourly rates through reduction in current vacation compensation levels, elimination of paid birthdays, personal holidays and sick days, modification of Sunday-holiday premiums, and a reduction in night-shift differential and job title premiums. Employees at the lower end of the wage scale would incur a lower percentage reduction than the higher wage scale employees, in order to comply with existing federal minimum wage guidelines. The third proposal provides an alternative modification from the second proposal. It also proposes a reduction in current vacation levels, elimination of paid holidays, birthdays, personal holidays, sick days, elimination of the Sunday premium pay, modifying the holiday premium pay, and a reduction in night-shift differential and job title premiums. Under the third

alternate proposal, the total dollar amount of the projected fringe benefit reduction was higher than that under the second proposal. Additionally, the high wage group would have a slightly lower reduction in straight hourly wages than under the second proposal.

Also testifying for the Debtor was Joseph Hodnicki, a research librarian and labor analyst employed by counsel for the Debtor, who performed the "costing-out" of the existing agreements based on the terms thereof, his review of the Debtor's first quarter 1990 compensation and payroll records for its employees, and the current seniority roster. Hodnicki explained the methodology he employed in analyzing and projecting twelve month labor costs under the existing collective bargaining agreements and the proposed modifications thereof. Hodnicki attended the several meetings held among representatives of the Debtor and the Locals. He also prepared and submitted the accompanying cost-out computations and related financial information for the tabled proposals. He attended the meetings in May, June and July at which time the proposals were presented, discussed, and negotiated. He answered all subsequent inquiries from representatives of the Locals. Reformatted data was supplied as requested. As of the date of his testimony, no written counter-proposals had been received by the Debtor from any Local. Apparently, none of the Locals had rejected any of the Debtor's proposals. However, Local 881 had made some oral counter-proposals.

Hodnicki corroborated Garofalo's testimony that although not tabled as one of the proposals, the Debtor would negotiate a snap back, gain sharing, or a revenue sharing provision, upon the Debtor reaching certain targeted revenue levels as a means of buffering the requested concessions. In Hodnicki's opinion, the first alternate proposal would be the easiest for the Debtor to implement and administer. On the other hand, the third proposal would have the least overall adverse impact on affected employee paychecks. None of the proposals reduce or cut back on any of

the health, welfare or pension benefits under the collective bargaining agreements.

Gregory Joseph was the last witness who testified. He is employed as a CPA managing the retail accounting department for Midland Grocery Company. The Debtor contracted with Midland for certain accounting services. Joseph's work for the Debtor includes preparation of its balance sheets, profit and loss statements and other related financial reports, based on the source documents containing the Debtor's daily financial information for each store, including the evidence comprising the summary of the Debtor's profits and losses from 1988 through June 30, 1990. Based on that evidence, Joseph was of the opinion that the Debtor is currently experiencing a continued negative cash flow and could not likely continue present operations for more than a few weeks. Based on those financial records, Joseph was of the further opinion that current operational expense levels need be reduced twenty-five to thirty percent for the Debtor to survive.

All documentary evidence offered by the Debtor was admitted without objection. The parties stipulated that the evidence of the Debtor's sales figures, payroll, benefit costs and expenses were accurate. The Locals did not offer any testimonial or documentary evidence. Counsel for the parties stipulated to the Locals' following offer of proof. The parties continued to meet and negotiate in good faith through the conclusion of the evidentiary hearing. On July 16, 1990, the Locals made the following counter-proposals which in their opinion, would likely be supported by the respective rank and file memberships: (1) ten percent 1990 wage cuts; (2) forego the scheduled wage increases for 1990 under the agreements; (3) reduce vacation compensation benefits by fifty percent for one year; and (4) include a snap back provision in each agreement for all concessions granted, effective two weeks before the respective expiration dates of the agreements. The parties indicated a willingness to continue negotiations after the matter was taken under advisement, pending a ruling by the Court. At the conclusion of the hearing, the Court was advised by respective counsel for the secured creditors that the senior secured lenders were willing to extend the terms and conditions of the existing cash collateral orders until August 6, 1990. The junior secured creditor, Beverly Bank, however, was not willing to extend the terms of the cash collateral order. Beverly's decision was based upon the Debtor's continued negative cash flow, absent some form of interim relief under section 1113(e).

The Debtor's motion for interim relief pursuant to section 1113(e) was filed on July 2, 1990 and sought an overall fifteen percent reduction in labor costs from current straight-time hourly compensation and reduced pension fund contributions, pending decision on the instant motion. Based on the foregoing evidence, the Court allowed that motion, finding that interim relief was essential to the continuation of the Debtor's business. The finding still applies at this time and over the next month preceding the filing of the Debtor's plan. The Court conditioned the interim relief on a concurrent and commensurate fifteen percent reduction in compensation paid to the six nonunion executive and administrative employees under the rationale favoring the flexibility of the Court's equitable power noted in *In re Russell Transfer, Inc.*, 48 B.R. 241 (Bankr.W.D.Va.1985). The Order for Interim Relief dated July 16, 1990, became effective July 22, 1990, until midnight August 5, 1990, unless otherwise ordered by the Court or agreed by the parties. It was intended to allow the Debtor to operate at a break even basis so as not to further erode the cash collateral position of the junior secured creditor and the Debtor's overall asset base. Under *Russell Transfer*, relief pursuant to that Order will be extended from August 5, 1990 to and including August 28, 1990, as further discussed herein.

## IV. APPLICABLE STANDARDS

Section 1113 was enacted in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which allowed a debtor to reject a collective bargaining

agreement unilaterally. Congress agreed that a debtor should be able to reject such agreements, but not that a debtor should be able to do so on its own. The *Bildisco* case "remains an important indicator" of the meaning of the Bankruptcy Code. *In re Sierra Steel Corp.*, 88 B.R. 314, 316 n. 2 (D.Colo.1987). While section 1113 created new procedural requirements, it did not overrule, but codified *Bildisco's* substantive standards. *See e.g., In re Fiber Glass Indus., Inc.*, 49 B.R. 202, 203 (Bankr.N.D. N.Y.1985). As the Tenth Circuit noted, "[w]hile new procedural requirements have been imposed, the approach to the required balancing of the equities should not be different from the instruction provided in *Bildisco*." *International Brotherhood of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1461 (10th Cir.1986). Pursuant to section 1113(c), the Court shall approve an application for rejection of a collective bargaining agreement only if the Court finds that: (1) the Debtor has, prior to the hearing, made a proposal that meets the requirements of subsection (b)(1); (2) the authorized representative of the employees has refused to accept such proposal without good cause; and (3) the balance of the equities clearly favors rejection of such agreement. 11 U.S.C. § 1113(c).

Although section 1113(c) references only rejection and not modification, the same requirements apply to the latter form of relief. Otherwise, the mandate of section 1113(f), stating that no provision of title 11 shall be construed to permit unilateral termination or alteration of any provision of a collective bargaining agreement, prior to compliance with the provisions of section 1113, would be meaningless. *See* 11 U.S.C. § 1113(f). The legislative history of section 1113 is not instructive. The legislative history has been explored in detail in several cases. *See e.g., In re Carey Transportation, Inc.*, 50 B.R. 203, 206 (Bankr.S.D.N. Y.1985), *aff'd sub nom. Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82 (2d Cir.1987); *In re Century Brass Products, Inc.*, 795 F.2d 265, 273 (2nd Cir. 1986); *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074, 1091 (3rd Cir.1986); *In re Royal*

*Composing Room, Inc.*, 848 F.2d 345, 352–354 (2nd Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989); *In re Ionosphere Clubs, Inc.*, 114 B.R. 379, 394–400 (S.D.N.Y.1990). No committee reports were issued on the statute. The legislative history consists primarily of comments made by legislators who were not speaking for the committee as a whole. *See In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887, 890 (10th Cir.1990) (legislative history consists of little more than self-serving statements by opposing partisans); *In re Express Freight Lines, Inc.*, No. 89–02929, slip op. at 11 (Bankr.E.D. Wis. July 13, 1990). Statements by an individual legislators, even a sponsor or conferee, do not have controlling effect on statutory interpretation, but when those statements are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent. *Brock v. Pierce County*, 476 U.S. 253, 263–64, 106 S.Ct. 1834, 1840–41, 90 L.Ed.2d 248 (1986); *Monterey Coal v. Federal Mine Safety & Health Review*, 743 F.2d 589, 596 (7th Cir. 1984).

The sparse legislative history referencing section 1113(b)(1)(A) touches on "necessary modifications" to such agreements. *See* 130 Cong.Rec. 7496 (daily ed. June 29, 1984) (remarks of Rep. Morrison). Section 1113(b)(1) expressly uses the phrase "necessary modification" and its requirements are incorporated into section 1113(c)(1). Referencing proposed modifications in section 1113(b)(1)(A) as part of the standards incorporated by reference in subsection (c), creates the seemingly latent ambiguity concerning the form of relief available. Although the language of subsection (c) expressly references "rejection", it is not clear that rejection is the only form of relief which may be allowed or denied, given the reference to subsection (b).

The starting point in interpreting a statute is the language of the statute. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). When a statute is clear and unambiguous on its face, there is no need to look to the legislative history as a guide to its

meaning. *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1280–81, 6 L.Ed.2d 575 (1961). Nevertheless, a literal construction is inappropriate if it would lead to absurd results or thwart the obvious purpose of the statute. *In re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *Smith v. Bowen,* 815 F.2d 1152, 1154–55 (7th Cir.1987). Thus, the Court concludes that not only may such agreements be rejected under section 1113(c), but that if all the requirements are met, such agreements can be alternatively modified in the exercise of the Court's discretion in balancing the equities under section 1113(c) and rendering its judgment as deemed necessary and appropriate under section 105(a). Such a construction does not thwart the purpose of the statute. Rather, it advances the Court's ability to decide the matter at bar in accordance with the spirit of the statute.

■ Perhaps the earliest leading case interpreting the requirements of section 1113 is *In re American Provision Co.,* 44 B.R. 907 (Bankr.D.Minn.1984). Judge Kressel set forth nine elements that must be established by the Debtor:

1. The debtor must make a proposal to the union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all affected parties are treated fairly and equitably.

5. The debtor must provide to the union such relevant information as is necessary to evaluate the proposal.

6. Between the time of making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*Id.* at 909; *see also In re Amherst Sparkle Market, Inc.,* 75 B.R. 847, 849 (Bankr.N.D. Ohio 1987). The Debtor has the burden of proof with respect to all nine elements and must demonstrate each element by a preponderance of the evidence. *In re Walway Co.,* 69 B.R. 967 (Bankr.E.D.Mich.1987), *citing American Provision Co., supra.* Once a prima facie case has been established, the burden of refutation shifts to the Locals with respect to elements five, seven and eight. *American Provision Co.,* 44 B.R. at 909; *accord, In re Salt Creek Freightways,* 47 B.R. 835, 838 (Bankr.D. Wyo.1985).

■ Section 1113 is meant to encourage collective bargaining, *In re of Century Brass Products, Inc.,* 795 F.2d 265, 273 (2d Cir.1986), *cert. denied,* 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986), and creates an expedited form of collective bargaining with a number of safeguards designated to insure that employers cannot use Chapter 11 solely to rid themselves of unions, but only propose modifications that are truly necessary for the company's survival. *In re K & B Mounting, Inc.,* 50 B.R. 460, 462–63 n. 3 (Bankr.N.D.Ind.1985). The requirement of fair and equitable treatment under the proposal to modify does not equate with identical or equal treatment. *In re Allied Delivery System Co.,* 49 B.R. 700 (Bankr.N.D.Ohio 1985). The element requiring that all creditors, the debtor and all affected parties are treated fairly and equitably serves the purpose of spreading the burdens of saving the company to every constituency while ensuring that all sacrifice to a similar degree. *Century Brass Products,* 795 F.2d at 273. Section 1113 motions are determined on a case-by-case basis as to whether changes in the labor contract are necessary for a successful reorganization. *In re Car-*

ey Transportation, Inc., 50 B.R. 203 (Bankr.S.D.N.Y.1985), *aff'd sub nom. Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82 (2nd Cir.1987).

There is a split among the courts of appeal as to whether necessary modifications are those that are essential to prevent liquidation or those that also will enable reorganization to occur. *Compare Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074 (3rd Cir.1986) *with Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82 (2nd Cir.1987). *Wheeling* adheres to a stricter view allowing only absolutely minimal changes intended to forestall liquidation. 791 F.2d at 1088–89. *Carey* takes a broader view and allows modifications that promote the long term reorganization of the debtor. 816 F.2d at 90. *Carey* notes that in order to defeat rejection under section 1113(c)(2), a union must come forward with evidence of the reason it is declining to accept the debtor's proposal, in whole or in part, prior to the hearing. *Id.* at 92; *see also* Comment, *The Standard for Rejecting Collective Bargaining Agreements in Bankruptcy: Labor Discovers It Ain't "Necessarily" So*, 63 Notre Dame L.Rev. 99 (1988).

■ When it is clear a debtor needs relief, intransigence by the union, in the prepetition negotiations, may also warrant rejection. When the union fails to articulate its reasons for rejection of a debtor's proposal during pre-hearing negotiations, rejection is without good cause. *See In re Royal Composing Room, Inc.*, 848 F.2d 345 (2nd Cir.1988) *cert. denied,* — U.S. ——, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989). Rejection was warranted in part where a union delayed in responding to proposals and refused to negotiate. *In re Sierra Steel Corp.*, 88 B.R. 337, 340–41 (Bankr.D.Colo.1988). One court has held that even if a proposal contains modifications, which if implemented, would violate labor law, it does not relieve the union of its duty to confer in good faith. *In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887, 891 (10th Cir.1990).

■ Courts have utilized various factors in the analysis under section 1113. One factor is the extent of the savings to be realized by the debtor and any alternate means of cost reduction. *In re Valley Kitchens, Inc.* 52 B.R. 493 (Bankr.S.D.Ohio 1985). Rejection shown to be necessary for the debtor's operation is most persuasive evidence of cause to reject. *In re Sol–Sieff Produce Co.*, 82 B.R. 787 (Bankr.W.D.Pa. 1988); *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797 (Bankr.W.D.Ky.1985). Other factors to be considered include the relative amount of management salaries compared to the union wages; the identity of the other creditors; the amounts of their claims and the impact of continuing the existing labor contracts on same; whether the employees would react to rejection by striking, and if that would injure the debtor; and the relative amounts of the employees' section 502(g) damage claims for rejection and the impact thereof on the chance of confirming a plan of reorganization. *See International Brotherhood of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460 (10th Cir.1986). In balancing the equities, other factors have included consideration of the possibility of liquidation; the impact of the losses suffered by the individual employees in proportion to the losses suffered by the other creditors; and the good faith of the parties. One authority concludes that the balancing of the equities test under section 1113(c) remains as it did before the 1984 amendments. *See* 1 Ginsberg, *Bankruptcy*, § 7.04(f) n. 223 at 566 and § 7.04(e)(6) at 561–562 (2d ed. 1989).

## V. DISCUSSION

■ The preponderance of the evidence indicates that all the requirements of section 1113(c) have been met. Prior to the hearing, the Debtor made its alternative proposals which met the requirements of section 1113(b)(1). The Locals have refused to accept any one or more of the proposals without good cause. There is no evidence of rejection of the proposals, any reasons therefore, or any explanation for the delay in responding to the proposals with the counter-proposals made on the last of day of the hearing. The balance of the

equities clearly favors modification of the collective bargaining agreements, rather than rejection at this time.

All nine elements of the *American Provision* holding have been established by the Debtor's proofs: (1) the Debtor made the alternative proposals to modify the agreements in May, 1990 (Debtor Exhibit Nos. 4, 5 and 6); (2) the proposals were based on the most complete and reliable information then available (Debtor Exhibit Nos. 4, 5 and 6); (3) the proposed modifications are necessary to permit the Debtor's reorganization (Debtor Exhibit Nos. 8, 14, 15 and 16); (4) the proposed modifications assure that all creditors including the Debtor and other affected parties are treated fairly and equitably; (5) the Debtor has provided to the Locals such relevant information as is necessary to evaluate the proposals (Debtor Exhibit No. 7—current seniority roster and payroll rate), (Debtor Exhibit No. 8—twelve month proforma), (Debtor Exhibit Nos. 9, 10, 11, 12, 13—additional financial information provided to the International Union's Director of Research including proposed modified wage rate schedules for each Local's membership); (6) between the time the Debtor's proposals were made in May, 1990, and the time of the hearing in July, 1990, the Debtor met at reasonable times with the Locals on at least two occasions in June, 1990 and once in July; (7) at the meetings, the Debtor conferred and negotiated in good faith in attempting to reach mutually satisfactory modifications to the agreements; (8) the Locals have refused to accept any of the proposals without good cause; and (9) the balance of the equities clearly favors further modifications, as more preferable than rejection.

Even under the more restrictive view taken by the Third Circuit in *Wheeling*, the proposals seek only essential and minimum modifications which the Court finds necessary and amply supported by the evidence. The objective of the modifications also achieves the short-term goal of preventing the Debtor's imminent liquidation. The undisputed evidence is that the Debtor made all possible effective cost reductions in other operational expenses. Absent the re-

quested modifications of the agreements to reduce its labor costs, it will liquidate in a matter of weeks. There is no evidence of any injection of fresh working capital at this time or anticipated in the future. The requested labor cost reductions will result in much needed savings to the Debtor and will have a direct and immediate financial impact on its continued operation. Secured creditors with perfected liens in the Debtor's cash collateral have already been adversely impacted by the post-petition net losses averaging about $6,000.00 per week. Those creditors have no other means of adequate protection under section 361 *et seq.* They possess liens on virtually all the Debtor's property pre-petition and post-petition and there is no other significant property interest in the Debtor's estate to give the secured creditors to adequately protect them against further cash losses. The secured creditors have effectively borne the post-petition losses from the Debtor's continued operations. They should not be expected to continue to subsidize post-petition operations at a loss, unless some of the burden is equitably shared through reduction of the Debtor's labor costs, both union and nonunion.

In addition, the requested modifications will foster the more expansive view of section 1113 taken by the Second Circuit in *Carey*, and will enhance the prospects of the Debtor's long term financial viability over the remaining terms of the agreements. Prior to the expiration of those agreements, the Debtor will either successfully reorganize or this case will follow one or the other alternate courses prescribed by section 1112(b): conversion to Chapter 7 or dismissal. The proposed modifications significantly enhance the probability of the Debtor successfully reorganizing, more so than if the agreements continue unmodified under the views taken in *In re Cook United, Inc.*, 50 B.R. 561, 563 (Bankr.E.D.Ohio 1985) and *In re Walway Co.*, 69 B.R. 967, 973 (Bankr.S.D.Mich.1987).

The Locals' arguments for denial of the motion are as follows: (1) the Debtor's failure to formally include snap back provisions in its proposals is fatal under *Wheel-*

*ing* and thus, the third *American Provision* element requiring the proposed modifications to be necessary to permit reorganization is not met; (2) no concessions have been granted by the secured creditors who are not sharing their equitable burden and therefore, the fourth element of proof under *American Provision* is lacking; (3) the balance of the equities does not clearly favor modification or rejection because the Debtor's financial problems are attributable to declining sales, and hence, the ninth *American Provision* element is lacking; and (4) rejection would create large burdensome employee claims under the agreements and further create the possibility of a strike. The Court is not persuaded by any of the Locals' arguments.

The evidence was clear that snap back provisions, although not formally tabled, were negotiable from the Debtor's point of view and apparently have been a topic of bargaining in the continuing negotiations of the parties. Such negotiations over this critical provision should continue during the remaining month before the Debtor's plan and disclosure statement are due. The Court has not yet conducted section 506(a) valuation hearings. Hence, it is premature for the Locals to conclude that any of the secured creditors are fully secured, or oversecured. In fact, the secured creditors may be substantially undersecured, given the schedules filed by the Debtor. The evidence is undisputed that the Debtor's continued post-petition negative cash flow has impaired secured creditors' cash collateral positions. Moreover, because a plan of reorganization has not yet been filed, it is likely under the facts and evidence that the secured creditors will have to make concessions if a consensual Chapter 11 reorganization can be negotiated. Furthermore, the evidence is undisputed that the Debtor is certain to liquidate, absent modification of the agreements. Any section 502(g)(2) employee damage claims may be significant, but the Locals have not furnished any evidence of the amount or potential impact of same on the scheduled claims of the other creditors. Although the employees affected may possibly strike in protest to a decline in wages and bene-fits, it is clear they will have no jobs to strike about in the event the Debtor ceases operations and is forced to liquidate its assets within the next few weeks. The fact that snap back provisions were not formally tabled by the Debtor, and thus fatal under *Wheeling*, is not outcome determinative. *Wheeling* is not controlling authority, and to date, has not been followed by the Seventh Circuit. Consequently, the Court finds that the absence of snap back provisions in the Debtor's original proposals, in light of the undisputed evidence that it has been willing to negotiate same, is not fatal to the requested relief.

As additional interim relief under section 1113(e), the Court will allow modification of the agreements as granted under the July 16, 1990 Order for Interim Relief and extend same to August 28, 1990, rather than allow rejection at this time. The Debtor has been a union employer for over forty-five years. The existing agreements were apparently the product of good faith collective bargaining between the Debtor and the authorized representatives of its union employees. The agreements were negotiated in 1988 and expire by their own terms approximately one year hence. If the Debtor's operations are to continue and it can be successfully reorganized, it should continue labor negotiations and business operations as a union employer. In so doing, both the congressional policies favoring business reorganization under Chapter 11 of the Bankruptcy Code are harmonized with the congressional policies favoring collective bargaining under the National Labor Relations Act.

Modification rather than rejection was the principal relief sought by the Debtor in the instant motion. If section 1113 is used to modify the agreements rather than reject same at this time, the Court avoids the undesirable effect of the employer unnecessarily divesting itself from burdensome union contracts. If the requirements of section 1113 are met through continued negotiations relative to modification of the agreements rather than outright rejection, the result can allow the employer to reorganize under the Bankruptcy Code while

the union employees still receive substantial benefits through the National Labor Relations Act. If the parties cannot negotiate mutually satisfactory snap back provisions and other terms within the next month, then the Court will allow rejection of the agreements based on the foregoing evidence. In this fashion, the express language of section 1113(c) and (e) will be followed and upon rejection, if the parties have not come to terms, the union employees' right to strike and other rights under applicable law can be fully exercised if they so choose.

Accordingly, the Court finds from the evidence that the agreements need to be modified along the lines of the third alternative proposal made by the Debtor. The modifications should be upon similar and commensurate aggregate compensation reductions imposed on the nonunion employees as referenced in the motion. The Debtor's suggested modifications are reasonable but, so are the Local's counter-proposals in providing for snap back provisions. The agreements should be modified by the inclusion of some form of snap back provisions along the lines requested by the Locals. If the Debtor can successfully reorganize in Chapter 11 and return to some reasonable level of profitable operations, then the Debtor should be able to pay the union and other employees for the concessions made now. The exact terms and conditions of the snap back provisions shall be further negotiated between the Debtor and the Locals and incorporated into the Debtor's plan of reorganization and disclosure statement. The parties are required to continue to negotiate in good faith as prescribed by the National Labor Relations Act and *American Provision*, 44 B.R. at 910–911.

Because the Locals will be negotiating with the Debtor over the plan terms regarding payment of the over $40,000.00 scheduled unpaid employee benefit plan contributions, negotiations on the terms of the snap back provisions can simultaneously occur. The parties, having already suggested and started negotiations over the snap back provisions, are best able to negotiate mutually satisfactory and economical-

ly feasible language. Continued negotiations among the parties enhances the prospect for a successful reorganization in which the Debtor's business survives and all of its creditors can receive maximum payments on their claims.

On the other hand, if the agreements were allowed to be rejected in toto at this time, and the union employees effectively closed the Debtor's operations through a strike, or if allowed to be unmodified, and the Debtor is forced to liquidate because of continued negative cash flow, both the Debtor's and the Locals' interests are not best served. The Debtor would have no ongoing business to reorganize and the union employees would have no jobs under either scenario. The requested modifications of the agreements under the Debtor's third alternative proposal, as further modified to meet the counter-proposals for snap back provisions, equitably balances the interests of all affected parties. Such modifications will most likely keep the Debtor's business open to reorganize and allow the employees to retain their jobs and many of the benefits under the agreements. In the interim, both sides should remain at the bargaining table and negotiate towards a consensual plan of reorganization. The Debtor's financial condition is dire and its time runs short. If the parties cannot reach mutual agreement by the time the Debtor's plan and disclosure statement are due, the evidence clearly favors rejection of the existing agreements at that time.

## VI. CONCLUSION

For the foregoing reasons, the Court hereby allows the motion to modify the collective bargaining agreements and under section 1113(e) extends the July 16, 1990 Order for Interim Relief until August 28, 1990. Such modifications of the agreements are conditioned upon similar commensurate aggregate compensation reductions imposed on the nonunion employees as well. The alternative relief of rejection under section 1113(a) and (c) will be allowed if the parties are unable to negotiate mutually satisfactory terms and conditions, as previously outlined, by or before August

28, 1990, to be incorporated in the Debtor's plan of reorganization and disclosure statement.

This Opinion is to serve as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.