### In the Matter of K & B MOUNTING, INC., Debtor.

### Bankruptcy No. 84–30804.

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

April 22, 1985.

Patrick Whisler, Thomas Sciortino, Elkhart, Ind., for debtor.

Scott C. Soldon, Milwaukee, Wis., for Union Local.

## ORDER

ROBERT K. RODIBAUGH, Bankruptcy Judge.

On January 31, 1985, debtor in possession K & B Mounting filed motion for rejection of collective bargaining agreement. Hearing on the motion was held on February 28, 1985, and trial was conducted on March 12, 1985. The time for filing of briefs having passed, the Court took the motion under advisement on March 29, 1985.

K & B Mounting is engaged in the business of selling and installing truck equipment. Its president, Frank McNamee, filed a voluntary chapter 11 petition on behalf of the company on August 17, 1984. The Statement of Financial Affairs states that the company is located in South Bend, Indiana; however, Mr. McNamee testified at trial that its business operations were in Detroit, Michigan. He also testified that K & B Mounting has eleven employees, eight of whom are covered by a union contract.

1. *Jurisdiction*

The court has jurisdiction over the parties and subject matter of the action. 28 U.S.C. § 1334, and the General Order of Reference of the District Court for the Northern District of Indiana dated July 11, 1984, entered pursuant to 28 U.S.C. § 157.

2. *Motion for rejection of collective bargaining agreement.*

In its motion to reject the collective bargaining agreement K & B Mounting alleged that, although it had contacted Teamsters Union Local 299 of Detroit, Michigan, on numerous occasions in an effort to discuss the employment contract, the union had cut off the discussions. Because continued adherence to the collective bargaining agreement has caused the debtor serious cash flow problems, the debtor proposed modifications to the existing agreement. K & B Mounting alleged that the union had neither accepted nor rejected the proposal at the time the debtor had filed the motion to reject.

The proposal of K & B Mounting was made by letter to Stanley Baker, business representative of Teamsters Local Union No. 299, by Thomas P. Sciortino, attorney for the debtor. While making clear that the offer was not all-inclusive or final, counsel for the debtor presented the following proposal of K & B Mounting:

The employer is requesting terms in the contract indicating a one cent per mile reduction in the truckaway volume; a five cent per mile reduction in the driveaway rates; a fifteen cent per hour reduction in the wages of all hourly employees; and a suspension of payments under the health, welfare and pension plan. As a substitute for payments under the health, welfare and pension plan, the employer would join a plan under Blue Cross/Blue Shield, and pay one-half of the cost of that. The employee would pay the other one-half of the cost. Additionally, each employee who is receiving payments under the pension plan would receive a $2,000.00 contribution towards an IRA, such contribution to commence during the fiscal year which ends after our present one.

Letter of September 5, 1984, from attorney Sciortino to union representative Baker. See Motion for Rejection of Bargaining Agreement, exhibit B, filed January 31, 1985.

On November 7, 1984, Mr. Baker responded by letter to the debtor's proposal. He reported that the result of a meeting between himself and the employees of K & B Mounting "was a unanimous vote for the rejection of the Company's proposal." He then presented a counter-offer.

The employees have instructed Teamsters Local Union No. 299, to negotiate

the National Master Automobile Transporters Agreement in its entirety. Letter of November 7, 1984, from Baker to Sciortino. See Motion for Rejection of Bargaining Agreement, Exhibit A, filed January 31, 1985.

### 3. Negotiations prior to motion.

Two years prior to bankruptcy K & B Mounting had withdrawn from the Multi-Employer Bargaining Unit and had notified Local No. 299 of its intent to negotiate a separate collective bargaining agreement. See letter of January 13, 1982, Union's Trial Exhibit 6. Since then the union and employer K & B Mounting had been operating on an informal day-to-day basis with no signed collective bargaining agreement. However, K & B Mounting has maintained full payments of the insurance and pension benefits and has complied with the other terms and conditions of the collective bargaining agreement negotiated with other employers in the multi-employer bargaining unit. See Pretrial Brief of Local Nos. 299 and 364 at p. 2, filed February 22, 1985.

On August 15, 1984, attorney Sciortino notified Mr. Baker by letter of the company's filing for relief in bankruptcy, and suggested a meeting in his offices "to discuss both the [labor] contracts and the matters surrounding the Union/K & B relationship." Union's Trial Exhibit 7. However, the parties were unable to agree on a meeting place. Therefore on September 5, 1984 Mr. Sciortino opened negotiations through the mail. He presented the proposal of K & B Mounting and offered alternative locations for a meeting to discuss the modifications. Union's Trial Exhibit 8.

Mr. Baker refused to negotiate with Mr. Sciortino until he had received notification from company president McNamee that Mr. Sciortino in fact represented the company. He then responded to the debtor's proposal by rejecting the company's suggested modifications and by offering the master agreement under which the company had been working prior to 1982. Movant's Trial Exhibit N. Since the parties still could not agree on the location for negotiations, no further communication was established. The debtor filed its motion for rejection of the collective bargaining agreement on January 31, 1985.

### 4. 11 U.S.C. § 1113.

The Bankruptcy Amendments and Federal Judgeship Act of 1984 [BAA] created a new Bankruptcy Code section that governs the rejection of collective bargaining agreements in Chapter 11 proceedings. Section 1113 was written by the Congress in response to the Supreme Court decision N.L.R.B. v. Bildisco and Bildisco,[1] 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482, [11 BCD 564] (1984). As a result, rejection of a collective bargaining agreement is no longer governed by 11 U.S.C. § 365[2], but rather by 11 U.S.C. § 1113, which delineates the procedures to be followed and the standards to be applied in rejecting a labor contract.[3] The pertinent provisions follow:

---

**1.** The Bildisco decision established an equitable standard by which to measure rejection of an executory contract and permitted a debtor to ignore a labor contract immediately upon filing under chapter 11. The latter half of the decision, unilateral rejection of a labor contract, was unacceptable to organized labor. Therefore the labor lobby worked effectively through Congress to amend the Supreme Court decision. Full analyses of the process which led to the creation of the new Code section 1113 are found in Rosenberg, R., "Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances," 58 Am.Bankr.L.J. 293 (Fall 1984); Gibson, R.H., "The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. ¶ 1113," 58 Am.Bankr.L.J. 325 (Fall 1984); and Bernstein,

S.B., Bankruptcy Practice After the Amendments Act of 1984, (PEC 1984).

**2.** 11 U.S.C. § 1113 became effective upon the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act and applies only to cases filed after the date of enactment, July 10, 1984. § 553 of H.R. 5174; BAA § 541(c).

**3.** The new section 1113, found in Sub-Title J of Title III of the Bankruptcy Amendments Act, has been described as "an elaborate and thorough-going revision of the rejection process for union contracts," one which "created an expedited form of collective bargaining with a number of safeguards designed to insure that employers can not use chapter 11 solely to rid themselves of their union, but only propose

§ 1113. (a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

The first and only reported case that has analyzed this new law [4] comes from the Minnesota Bankruptcy Court. *In re American Provision Co.*, 44 B.R. 907 (Bkrtcy.D. Minn.1984). That court found that nine requirements must be met for court approval of the rejection of collective bargaining agreements.

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the

---

modifications of the agreement that are truly necessary for the firm's survival." Gibson, "The New Law on Rejection of Collective Bargaining Agreements," *supra* at footnote 1, 58 Am.Bankr. L.J. 325 at 327. Although one court has criticized it as "not a masterpiece of draftsmanship" (*In re American Provision Co.*, 44 B.R. 907, 909 (Bkrtcy.D.Minn.1984)), a bankruptcy commentator has complimented the new section by stating that "overall, the conferees deserve their self-congratulatory speeches reprinted in the Congressional Record of June 29, 1984." Bern-

stein, *Bankruptcy Practice After the Amendments Act of 1984, supra* at footnote 1, at p. 121.

4. Several court decisions have been published concerning section 1113(e), which allows interim changes in a collective bargaining agreement. *In re Salt Freightways*, 46 B.R. 347, 12 B.C.D. 872 (Bkrtcy.D.Wyo.1985); *In re Wright Air Lines, Inc.*, 44 B.R. 744 (Bkrtcy.N.D.Ohio, 1984).

debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*Id.* at p. 909.

Two bankruptcy commentators have also examined the procedural framework required and the substance of the section 1113 rejection standard.

Judge Stanley B. Bernstein, in his *Bankruptcy Practice After the Amendments Act of 1984,*[5] emphasized that the new Code section 1113 provided a "process" by which labor contracts may be rejected.

There are now a defined set of discrete stages in the rejection process, with varying alternatives if the process aborts or bogs down at any stage.

*Id.* at p. 121. He also analogized the section as a "barrier to the rejection of union contracts ... [that] must be scaled before the bankruptcy court may consider an application to reject the contract." *Id.* at p. 122.

Richard H. Gibson, in his article "The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113," 58 Am. Bankr.L.J. 325 (Fall, 1984), describes section 1113 as a three-step procedure set up in order to encourage collective bargaining. 58 Am.Bankr.L.J. at p. 328.

The first stage is the mandatory proposal by the debtor to the union. The debtor is obligated to make a proposal for modification of the labor contract to the collective bargaining representative after filing the Chapter 11 petition but before seeking court approval for rejection of the labor contract.

By implication, it is not sufficient for the debtor to claim that it bargained to an impasse with the union before it filed its Chapter 11 petition.

Bernstein, *supra,* at p. 122.

The proposal must meet certain statutory requirements. The proposed modifications must be necessary for the success of the debtor's reorganization.

[O]nly modifications which are necessary to a successful reorganization may be proposed. Therefore, the debtor will not be able to exploit the bankruptcy procedure to rid itself of the unwanted features of the labor agreement that have no relation to its financial condition and its reorganization and which earlier were agreed to by the debtor. The word "necessary" inserted twice into this provision clearly emphasizes this required aspect of the proposal which the debtor must offer and guarantees the sincerity of the debtor's good faith in seeking contract changes.

130 Cong.Rec. S8898 (daily ed. June 29, 1984) (Sen. Packwood). They must evidence fair and equitable treatment of the creditors, debtor and all interested parties.

The fair and equitable language was intended by the conference to insure that the type of balancing that takes place when the court finally rules on rejection also takes place during these preliminary negotiations.

130 Cong.Rec. S8892 (daily ed. June 29, 1984) (Sen. Hatch).

... According to the conferees, that basically means that the economies in operation are now being borne solely or primarily by the employees covered by the union contract. Indeed, a strong inference may be drawn that the debtor has to prove that substantial concessions have been given to the debtor by suppliers, its secured creditors, state and local taxing agencies, and management and non-union employees.

... In the end, fairness and equity in connection with proposals for modifications of union contracts means that no significant participant in the reorganiza-

---

**5.** See footnote 1.

tion process gets a free ride; everybody shares in aiding the debtor, not just the covered employees.

Bernstein, *supra*, at pp. 123–124. In addition, the proposal must be soundly based upon "the most complete and reliable information available," and all information necessary to evaluate the proposal must be provided to the collective bargaining agent. 11 U.S.C. § 1113(b)(1)(A) and (B).

The second step or stage of this process occurs in the interval between the presentation of the proposal to the union and the judicial hearing on the application for rejection. During that period the debtor must engage in good faith negotiations with the union, pursuant to the requirement of 11 U.S.C. § 1113(b)(2). The amount of flexibility allowed the debtor in meeting this obligation is also a "good faith" test: the number of meetings and the reasonableness of the time spent in negotiation depends upon the complexity and detail of the proposal and of the data given to the union for its evaluation.

It is interesting to note that Senator Packwood intertwined the interpretation of what constitutes the debtor's "good faith" negotiation and the union's "good cause" rejection.

> The 'without good cause' language provides an incentive of pressure on the debtor to negotiate in good faith. In practical terms, this language imposes no barrier to rejection if the debtor's proposal has contained only the specified 'necessary' modifications. Thus, the language serves to prohibit any bad faith conduct by an employer, while at the same time protecting the employer from a union's rejection of the proposal without good cause.

130 Cong.Rec. S8898 (daily ed. June 29, 1984) (Statement of Sen. Packwood).

In other words, a debtor negotiates in good faith when it meets the requirement of section 1113(b)(1) by offering only necessary modifications which affect all parties equally. Furthermore, a union probably has good cause to reject "any proposal that is not necessary for the reorganization of the debtor or that unfairly burdens the unionized workers relative to other parties." Gibson, *supra*, 58 Am.Bankr.L.J. at 341.

The Minnesota Bankruptcy Court has also linked the "good faith" and "good cause" interpretations by placing on the union the burden of coming forth with the evidence for these two requirements.

> ... [O]nce the debtor has shown that it has met with the Union representatives, it is incumbent upon the Union to produce evidence that the debtor did not confer in good faith. And ..., once the debtor has shown that the Union has refused to accept its proposal the Union must produce evidence that it was not without good cause. Again, once the Union has come forward with evidence on these ... elements, the ultimate burden of persuasion on each still lies with the debtor.

*In re American Provision Co.*, 44 B.R. 907, 910 (Bkrtcy.D.Minn.1984).

No definition of "good cause" has been provided. However, bankruptcy courts are not meant to follow labor law decisions in determining what constitutes good cause.

> Senator Thurmond stated that this requirement "is obviously not intended to import traditional labor law concepts into the bankruptcy forum or to turn the bankruptcy courts into a version of the National Labor Relations Board."

130 Cong.Rec. S8888 (daily ed. June 29, 1984) (as cited in 58 Am.Bankr.L.J. at p. 340).

The final stage is the debtor's filing for court approval of rejection of the labor agreement. Although the application for rejection may be filed at any time after the proposal is made, there must be evidence of good faith negotiations with the union before the debtor turns to the court. It must be kept in mind that one of the main purposes of the new Code section is to encourage solution of the employer's labor problems through collective bargaining rather than by means of the debtor's unilateral action and recourse to the bankruptcy court. Gibson, *supra*, 58 Am.Bankr.L.J. at

327. Furthermore, once the application has been made, the hearing on that application must commence not later than fourteen days after the date of the filing.[6] 11 U.S.C. § 1113(d)(1).

It is at this point that the court must evaluate the equities of the case, and must find that "the balance of the equities clearly favors rejection" of the collective bargaining agreement.

Judge Bernstein believes that the standard established in section 1113(c) for approving or denying the rejection of a union contract naturally suggests a two-stage hearing. The first stage will consider the issues found in § 1113(c)(1) and (2); the second stage, an analysis of the "balancing of the equities," will be heard if the debtor prevails in its first stage of proofs.[7]

> The first stage addresses the related questions raised by § 1113(b) whether (i) the debtor's proposal included only *necessary modifications* of the union contract, (ii) the debtor's proposal was "based on the *most complete and reliable information* available at the time" of the proposal, (iii) the proposal assures that all creditors, the debtor and all of the affected parties are treated *fairly and equitably,* (iv) the debtor provided the *"relevant information"*: for evaluating the proposal, (v) the debtor met at *reasonable times* to *confer* in good faith over the modifications, and (vi) the union *refused to accept* the proposal *"without good cause."* [O]nly if the court finds on those issues [under ¶ 1113(c)(1) and (2)] in favor of the debtor will the second stage issue on the "balancing of the equities" be heard.[7]

Bernstein, *supra,* at p. 132.

Once this balancing stage is reached, the test is a broad equitable one, lacking rigidity. As both the language of section 1113(c)(3) and its legislative history suggest, this balancing test is a statutory codification of the central element in the *Bildisco* case. Gibson, *supra,* 58 Am.Bankr. L.J. at p. 343. However, the weighing of equities is not a new test; a substantial body of case law had used and interpreted that standard prior to the Supreme Court's *Bildisco* decision.[8] Therefore, although the legislative comments of this subsection give little guidance, earlier decisions have presented both the factors that the courts felt should be considered and those that the courts found controlling.

A bankruptcy court should examine these precedents in determining which factors are applicable to the case at bar and in considering the weight to be assigned to each factor. Bernstein, *supra,* at p. 135. One commentator has suggested that the factors boil down to one issue: the reallocation of economic risks and the choice of the parties best able to bear those risks. Bernstein, *supra,* at p. 138. To another commentator the most important factor is whether the labor contract is truly a serious impediment to reorganization.

> When [examining the factors that controlled the precedents], the long lists of equities quickly melts [sic] down to the one, single question which is almost always controlling: what effect will rejection of the agreement have on the firm's prospects for reorganization?

Gibson, *supra,* 58 Am.Bankr.L.J. at p. 345.

5. *The burden of proof.*

Minnesota Bankruptcy Judge Kressel carefully analyzed the burden of proof of showing that the nine requirements of section 1113 have been met. *In re American*

---

**6.** Pursuant to § 1113(d)(1), the court may extend the time for commencement of the hearing for a period not exceeding seven days, if required.

**7.** Bernstein's six questions to be answered in the first stage are virtually the same as the first eight requirements listed by Judge Kressel of the Minnesota Bankruptcy Court in *In re American Provision Co., supra* at footnote 3.

**8.** *In re Overseas National Airways, Inc.,* 238 F.Supp. 359 (D.C.N.Y.1965); *Shopmen's Local Union No. 455 v. Kevin Steel,* 519 F.2d 698 (2d Cir.1975); *In re Bildisco,* 682 F.2d 72 (3d Cir. 1982); *In re Brada Miller Freight Systems, Inc.,* 702 F.2d 890 (11th Cir.1983).

*Provision Co.,* 44 B.R. 907, 909 (Bkrtcy.D. Minn.1984). The court found that the debtor must prove, by a preponderance of the evidence, that all nine elements have been satisfied before a court may approve rejection of a collective bargaining agreement.

[S]ince these nine requirements form the bases of the debtor's motion, the debtor bears the burden of persuasion by the preponderance of the evidence on all nine elements. However that is not to say that the burden of going forward with the evidence should in all instances be on the debtor. Regardless of where the ultimate burden of persuasion lies, assignment of the initial burden of production depends on the circumstances.

*Idem.* However, the union is required to produce evidence in elements 5, 7, and 8.

In particular, as to elements 5, 7 and 8, I think that to a certain extent the burden of production of evidence should lie with the Union. As to element 5, I think that it is incumbent upon the debtor in the first instance to show what information it has provided to the Union. It is then incumbent upon the Union to produce evidence that the information provided was not the relevant information which was necessary for it to evaluate the proposal.

*Id.* at pp. 909–10.[9]

After analyzing the language of section 1113(c)(3), Judge Bernstein argues that the debtor's burden of proof is heavier than the "preponderance" burden in the final test of balancing the equities.

[T]he debtor's counsel has the burden of proving that the balance of the equities *clearly favors* rejection. The modifying adverb suggests that a preponderance of the evidence will not be sufficient.

Bernstein, *supra,* at p. 134.

6. *Application of the requirements of § 1113 to the debtor K & B Mounting.*

The court applied the section 1113 requirements to the facts herein, accumulat-

ed from the evidence and testimony of trial, the parties' briefs, and the record herein.

In the first stage of analysis, the debtor must prove by a preponderance of the evidence that he has fulfilled the requirements of sections 1113(c)(1) and (2). The debtor's proof, however, was woefully inadequate.

K & B Mounting did assert that it had serious cash flow problems, and its bankruptcy schedules revealed that its only major indebtedness was its obligation to the employees' health, welfare and pension plan. In his letter of September 5, 1984, counsel for the debtor asserted the following:

… It is necessary for everyone to accept the lesser benefit package in order for the company to survive. I need not explain to you the consequences to the employees were it to become necessary for the company to liquidate.

Thus the debtor does insist that the modifications suggested in its proposal are necessary for reorganization of the company.

However, neither the union nor the court could assess the necessity of these modifications, since the debtor did not substantiate its proposal with "relevant" information selected from "the most complete and reliable information available" when the debtor made its proposal. As stated above, the debtor's bankruptcy filings are hardly sufficient. The union should be supplied with detailed projections and recommendations, perhaps made by a management consultant, preferably one who is independent of the interested parties. The debtor should present full and detailed disclosure of its difficulties and its proposed short-run and long-run solutions. If the debtor so requests, the court may authorize entry of a protective order during this stage in order to prevent the disclosure of information furnished to the union where the disclosure could compromise the debtor's competitive position. Bernstein, *supra,* at pp. 125–126.

In summary, the debtor must provide to the union enough information to justify

---

**9.** For the Minnesota Bankruptcy Court's explanation of the union's burden of production of evidence as to elements seven and eight, see page 10 of this opinion.

each of its proposed modifications. The debtor was incorrect when it stated that it "need not explain" to the union the consequences of possible liquidation; that explanation is exactly what the debtor was required to make. And the test, in justifying each of the proposed modifications, is necessity, not convenience or desirability. Bernstein, *supra*, at p. 122.

> The debtor, in making such a proposal, is asking the union to sacrifice extremely important rights. Simple justice requires that the debtor only do so in a carefully considered and soundly-based manner.

Gibson, *supra*, 58 Am.Bankr.L.J. at p. 336.

The proposal clearly does not assure that all creditors and affected parties are treated fairly and equitably. Mr. McNamee, K & B's president, testified that he and his partner reduced their wages in 1981 and "tightened up on everything." They purchased equipment, for example, by paying by cash rather than by credit. The result of this management decision, however, was that, upon filing in bankruptcy the company had no secured debts, and the only major debt owed was that obligation of employee benefits under the labor contract. Therefore the proposal of K & B Mounting affects only one party in interest, the employees. The debtor has not shown that its proposal requires all parties directly affected—management, nonunion employees, suppliers as well as unionized workers—to sacrifice to a similar degree.

Since no meetings took place between the debtor and the union, the debtor has not met the requirement of meeting at reasonable times to confer in good faith over the modifications. However, the court is not unaware of the union's improper stance in these negotiations; the union's refusal to recognize or to meet with the attorney for the debtor reflected its lack of good faith in these proceedings.

Nevertheless, the court must say that the union had good cause to refuse to accept the proposal. The debtor has not met its burden in providing full information to the union or in providing a proposal which treats all parties fairly and equitably.[10]

Because the court cannot find in favor of the debtor on the first-stage issues under section 1113(c)(1) and (2), it need not reach the second stage "balancing of the equities."

Accordingly, the motion of debtor K & B Mounting for rejection of collective bargaining agreement is hereby denied.

SO ORDERED.

---

10. Congressional leaders intended that the revised rejection procedure of § 1113 should stimulate collective bargaining and limit the number of cases when a judge will have to authorize the rejection of a labor contract. 130 Cong.Rec. S8898 (daily ed. June 29, 1984) (comment of Senator Packwood). In accord with that intention, this court would have preferred the union to stimulate negotiations by requesting further information from the debtor or by explaining its rejection of the debtor's proposal. However, it is not so naive as to have expected it.