**In the Matter of GCI, INC., Debtor.**

**Bankruptcy No. 91–11288.**

United States Bankruptcy Court,
N.D. Indiana,
Fort Wayne Division.

Aug. 22, 1991.

Daniel J. Skekloff, Fort Wayne, Ind., for debtor.

Stephen Yokich, Chicago, Ill., for Retail, Wholesale & Dept. Store Union.

## DECISION

ROBERT E. GRANT, Bankruptcy Judge.

When a ship is in danger of foundering, the entire crew must bail or the ship may be lost, together with all hands. Unfortunately, in this case the debtor and the union which represents its production employees, The Retail, Wholesale, and Department Store Union, cannot agree as to how their ship will be bailed. Instead, they can only argue about which buckets should be used.

This matter is before the court on the debtor's motion to reject its collective bargaining agreement with the union, filed on July 16, 1991 and the union's objection thereto. Unlike other executory contracts which are governed by § 365 of the Bankruptcy Code, the rejection of collective bargaining agreements is governed by 11 U.S.C. § 1113.

Debtor's business involves the manufacture of printed circuit boards. The debtor filed a petition for relief under Chapter 11 on June 17, 1991. During the two years prior to the petition, the debtor lost substantial amounts of money, averaging $40,000.00 to $60,000.00 each month. Part of the reason for these losses was a decline in sales, due to the highly competitive nature of the debtor's industry. The second factor in the equation producing debtor's

losses is excessive costs associated with the operation of its business.

In an effort to return itself to profitability, the debtor has developed a recovery plan which addresses both of these problems. Under this plan, the debtor's goal is to restructure its operations so that it can conduct its business at a break even point of $300,000.00 in monthly gross sales. To do so will require a combination of increasing sales volume and reducing expenses. Many of the different aspects of the debtor's recovery plan, at least to the extent that they are exclusively within the control of the debtor, have already been implemented. The debtor has apparently successfully resolved quality control problems in the manufacturing process, which contributed to its competitive disadvantage. It has restructured its marketing operations in an effort to both increase sales and decrease the costs associated with generating those sales. Although the debtor has not yet achieved the sales level it has targeted, it projects that it should be able to do so by October or November of 1991. Accordingly, it appears that the debtor has already implemented those points of its recovery plan which are directed towards increasing sales and all that remains is for the future to determine whether or not those efforts will actually bear fruit.

The second aspect of debtor's recovery plan is to reduce its operating costs. As with the changes directed towards sales, many of the debtor's cost cutting measures have already been implemented. Of those which have not, most of them are not within the debtor's exclusive control. Instead, they depend upon the cooperation of third parties and/or the intercession of the bankruptcy court.

Debtor's labor costs, as measured in annual sales per employee, are higher than the industry average. Accordingly, its recovery plan contemplates generating a cost savings of approximately $29,000.00 a month from its employees. Of this savings, approximately $9,000.00 a month is to come from debtor's management and salaried employees. The remaining savings are designed to come from the employees represented by the union, as a result of changes in the collective bargaining agreement. The desired changes involve wage concessions, a reduction in holidays and vacations, changing the standard work week from five eight-hour days to four ten-hour days, eliminating the contract provision concerning seniority in determining employee layoffs and recalls, and eliminating the contract's provision requiring production work to be done by bargaining unit employees except in limited circumstances. Of these, it is the changes in the layoff/recall policy and the restrictions on production work from which the debtor expects to generate the greatest savings. Coincidentally, these are also the changes that the union opposes.

In an effort to apprise the union of its financial situation and open discussions with it concerning the needed concessions, the debtor met with the union on June 27, 1991. The purpose of this meeting was not to discuss any specific proposal but, instead, to provide background information so that the union could be apprised of the debtor's financial situation, its reorganizational goals and the types of concessions it would be seeking from the union. During this meeting, the union indicated that, while it might understand the need for concessions, tampering with seniority could not be among them and was not a negotiable issue. At the conclusion of the meeting, the parties agreed to meet again on July 1, 1991.

At the meeting of July 1, the debtor presented its initial proposal to the union for changes to the collective bargaining agreement. This proposal included changes in wages and benefits and working schedules. Although it did not include changes to the contract provisions concerning seniority and production work, it did indicate its somewhat tentative nature, through a notation that the company reserved the right to add additional proposals. The debtor and the union then agreed to meet again on July 3, 1991 in order to give the union time to review and digest the company's proposals and the financial information which had been provided earlier.

Fifteen minutes before the scheduled meeting of July 3 the debtor received a curt note from the union indicating that the financial information it had previously received was "not adequate." The reason for the inadequacy was not explained. The letter went on to request all state, federal, and local tax returns for the years 1989 and 1990. It also abruptly canceled the meeting, indicating that another would be scheduled after the union's New York office had the opportunity to review the financial information the debtor had provided.

The debtor promptly provided all of the information the union requested in its letter of July 3. It also asked for a meeting on July 5 in order to discuss the debtor's situation and proposals.

Interesting enough, in spite of the union's professed need for "New York" to review the debtor's financial information, the debtor found a document circulating on its production floor, dated July 3, 1991, captioned "R.W.D.S.U. AFL–CIO Local 835 Proposal." Since the debtor had received this document indirectly and without any background information or explanation, it asked the union to advise it of what it was, especially in terms of whether or not it constituted a counter to the debtor's proposal of July 1.

The union failed to appear for the meeting of July 5. The debtor contacted the union's representative by phone on that date to request a meeting for the morning of July 8 and to inquire about the union's apparent "proposal" of July 3. The union not only refused to comment on that document but also refused to meet on the morning of the 8th. As a result, by a letter of July 5, the debtor asked if the afternoon of July 8 would be more convenient.

By its own letter of July 5, the union requested additional financial information concerning the debtor and the bankruptcy. In also responded to the debtor's letter of July 3. (That letter had expressed regret about the union's failure to appear for the meeting scheduled that day and made inquiries about the union "proposal" found on the production floor.) The union's letter rudely refused to even acknowledge the existence of such a document and offered only to explain any parts of their own letter of July 3 that the debtor did not understand. (The union's letter of July 3 did nothing more than abruptly cancel the meeting scheduled for that date and demand additional financial information.)

The debtor promptly provided the financial information the union requested in its letter of July 5 and more. It also again asked to meet in order to negotiate the changes to the collective bargaining agreement on July 11. The union declined to respond to this invitation.

Having consistently declined to meet and discuss changes to the collective bargaining agreement, on July 8, 1991 the union filed an unfair labor practice charge with the NLRB premised in part upon the debtor's proposal to modify the contract. This charge was received by the debtor on July 11.

On July 9 the debtor made its second proposal to the union. While this proposal retained many of the same features from its predecessor, it deleted a proposal to eliminate or modify health care benefits. It also formally proposed changes to the contract's seniority provisions and restrictions on production work, which had been discussed as a possibility in the original meeting of June 27.

On July 11, the union finally indicated that it would be available to meet on and after July 29. By a letter of July 12 the debtor expressed its great regret that the union was unwilling to meet for contract negotiations until July 29. This letter also transmitted the debtor's final proposal, dated July 12, to the union. The debtor reiterated its desire to meet at any time and place to discuss the situation and expressed the hope that somehow further negotiations could commence before the 29th. The union apparently did not respond.

Between the date of the original meeting in late June of 1991 and the date the debtor's motion to reject the collective bargaining agreement was filed, the debtor repeatedly stressed the urgency of the situa-

tion that was confronting it. A large influx of capital was required in order to sustain operations into the fall of 1991. Although the debtor had located a lender who was willing to make these funds available, this willingness was largely dependent upon the debtor's ability to successfully implement cost cutting measures, including modification of the collective bargaining agreement. The debtor's state of affairs is sufficiently desperate so that unless these additional funds are secured in the very near future it will have no option beyond liquidation. Throughout this time the union demonstrated a callous indifference to the debtor's situation and the urgency with which the issues needed to be addressed. By extension, this indifference also extended to the union's constituency, the debtor's employees, who face the very real possibility that they may soon be without employment of any kind.

It was not until after the debtor's motion was filed that negotiations were conducted, on July 29 and 30, in accordance with the timetable decreed by the union. Those negotiations proved to be unsuccessful.

Section 1113 of the Bankruptcy Code establishes the conditions and procedures which must be fulfilled in order to reject a collective bargaining agreement. It provides:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement. 11 U.S.C. § 1113.

In addition to establishing the standard for rejection, § 1113 also contains a prohibition. Pursuant to paragraph (f)

No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section. 11 U.S.C. § 1113(f).

 The case law interpreting § 1113 has identified nine requirements which must be met before the court may authorize rejection. These are:

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement. *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr. D.Minn.1984) (footnote omitted). *See also In re Garofalo's Finer Foods, Inc.*, 117 B.R. 363, 370 (Bankr.N.D.Ill.1990); *Matter of K & B Mounting, Inc.*, 50 B.R. 460, 463–64 (Bankr.N.D.Ind.1985).

The debtor bears the burden of proving each of these nine elements. Once it has made a prima facia demonstration concerning rejection, the burden of production then shifts to the union. Nonetheless, the ultimate burden of persuasion ultimately rests with the debtor. *American Provision*, 44 B.R. at 909–910; *In re Salt Creek Freightways*, 47 B.R. 835, 838 (Bankr.D.Wyo.1985).

There is and can be little dispute that most of the elements required for rejection have been satisfied. The debtor made not one but three proposals to modify the collective bargaining agreement. These proposals were based upon the most complete and reliable information available at the time. Furthermore, the debtor has provided the union with all of the relevant information necessary to evaluate the proposals and conduct meaningful negotiations.

■■■ The proposed modifications are necessary to permit the reorganization of the debtor. Whether or not a modification is "necessary" does not require that the proposal "be limited to the bare bones relief that will keep it going." *In re Royal Composing Room, Inc.*, 848 F.2d 345, 350 (2nd Cir.1988). Instead, all that is required

is that modification "result in a greater probability of a successful reorganization than if the contract were allowed to continue in force." *Matter of Walway Co.*, 69 B.R. 967, 973 (Bankr.E.D.Mich.1987). *See also Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82, 89–90 (2nd Cir.1987). Nonetheless, "[t]he proposals must be more than potentially helpful; they must be directly related to the debtor's financial condition." *In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887, 893 (10th Cir.1990) (footnote omitted). This latter requirement prevents the debtor from injecting economically irrelevant issues into the bargaining process which would have no impact upon the debtor's financial condition. *K & B Mounting*, 50 B.R. at 464.

The debtor's proposals are limited to those which impact upon its financial condition and will certainly increase the probability of a successful reorganization. Implementing them will allow the debtor to retain a more productive, cost effective, versatile and efficient labor force than under the existing contract. Indeed, the need to modify the collective bargaining agreement is not disputed. Even the union concedes that modifications are appropriate in order to promote a successful reorganization.

The court also finds that the proposed modifications assure that all parties affected by this reorganization are treated fairly and equitably. The purpose of this requirement is to minimize, if not eliminate, the possibility that a debtor's employees will be required to bear the entire burden of a debtor's financial distress. *Salt Creek*, 47 B.R. at 838; *K & B Mounting*, 50 B.R. at 464–465. Although the union argues that no plan for the treatment of creditors has yet been concretely outlined or proposed, it cannot, in good conscience, deny that the debtor's creditors have not already been adversely impacted by this Chapter 11. Debtor's pre-petition unsecured creditors are going unpaid and must await confirmation of any plan before they will see any distribution on account of debtor's obligations to them. The secured creditors have also seen their rights impacted

by the petition, through the stay of any actions to proceed against their collateral. It is still too early in the reorganizational process to determine the full impact of these proceedings upon the value of secured claims or what further concessions may be required. *See Garofalo's*, 117 B.R. at 373. The debtor has apparently done as much as possible to extract concessions from its suppliers in order to acquire raw materials upon the most favorable terms possible. Debtor's management and non-union personnel are not immune either. Their numbers have already been dramatically reduced and those who remain will experience the same reduction in holidays, vacations, and compensation that the union employees would be subject to under the debtor's modifications.

■ To accept the union's argument would require the court to conclude that almost all aspects of any Chapter 11 reorganization must be cast in stone and the contours of any forthcoming plan clearly outlined before the debtor can seek concessions from the union. This, in the court's opinion, would place an almost impossible burden upon the debtor and essentially place the union in the position of being the last entity which could be impacted by the reorganization. A more appropriate scenario is to view the modification of a collective bargaining agreement as only one aspect of a much larger process of reconstructing a debtor's financial affairs, which may properly occur at any stage of the proceedings based upon the unique circumstances of each individual debtor. Thus, the fact that the requested modification may, as here, come early in the proceeding and before the precise details of any proposed plan can be known should not be fatal to the motion or preclude a finding that all affected parties will be treated fairly and equitably. *See Carey Transportation*, 816 F.2d at 91 ("Because a section 1113 application will almost always be filed before an overall reorganization plan can be prepared, the debtor cannot be expected to identify future alterations in its debt structure.").

The union cannot deny the debtor's continual willingness to meet with it between the date of the debtor's first proposal and the date of the hearing on the debtor's motion. The debtor bent over backwards and demonstrated a repeated willingness to meet at any and all reasonable times and places in order to discuss the proposed modifications with the union. Indeed, the debtor begged and pleaded for meetings and repeatedly stressed the urgency of the situation, but to no avail. The union had established its own timetable for these negotiations and its resolve to adhere to this timetable was inalterable.

■ The next element in debtor's burden of proof requires that it has conferred with the union in good faith in an attempt to reach a mutually satisfactory modification to the collective bargaining agreement. This element is derived directly from § 1113(b)(2) of the Bankruptcy Code which requires the debtor to meet with the union to confer in good faith. Despite the formulation, which has been developed for this aspect of the debtor's burden of proof, the obligation to negotiate in good faith is imposed not only on the debtor but also on the union. Both parties are required to confer in good faith. *Mile Hi Metal Systems, Inc.*, 899 F.2d at 892. Nonetheless, because the union is also required to have good cause for its refusal to accept the debtor's proposal, its conduct during the negotiations is usually analyzed as part of the good cause determination. *Id.*

■ The last and only potentially meaningful negotiating sessions before trial took place on July 29 and 30, in accordance with the union's timetable. Unfortunately, on July 26 the debtor laid off all of its bargaining unit employees. Over the weekend of the 27th and 28th production continued with the use of supervisory personnel. On the 29th the debtor began to recall its laid off employees. It apparently did so, however, without regard to seniority. In some instances, junior employees in the same department were recalled in preference to more senior employees. As a result of these layoffs and recalls, by the time of trial the debtor had implemented

precisely the same layoffs it desired to accomplish under the proposed modifications to the contract. The union contends that, in doing so, the debtor has violated § 1113(f) of the Bankruptcy Code, which prohibits the unilateral termination or alteration of the collective bargaining agreement without court approval. From this breach of duty, it argues that the debtor has failed to negotiate in good faith. In response to the union's argument, the debtor argues that it acted in subjective good faith and in accordance with the terms of the contract as it presently exists. Before doing so, it conferred with labor counsel who advised it that the proposed course of action was permissible under the terms of the existing contract.[1]

■ "Good faith bargaining is *conduct* indicating an honest purpose to arrive at an agreement as the result of the bargaining process." *Walway Co.*, 69 B.R. at 973 (emphasis added). The need to focus on the conduct of a party persuades this court that the determination of whether or not a debtor has conferred in good faith must be measured upon an objective rather than a subjective standard.

Despite the debtor's good faith belief that it was authorized to act as it did, an objective view of its actions indicates otherwise. A review of the list of the employees who have been laid off indicates that the layoffs were not done strictly in accordance with seniority. In some departments the most senior employees were laid off, in others the most junior, and in still other instances the layoffs involved employees with seniority somewhere between these two extremes. Furthermore, it does not appear that senior employees were given the opportunity to exercise their right to transfer to another department in which they were qualified, in order to bump less senior employees located elsewhere in the plant. Given this, it certainly appears to the court that the debtor has implemented layoffs and recalls in violation of the seniority provisions of the existing contract and, in doing so, has attempted to implement the seniority aspects of the collective bargaining agreement as the debtor would like it to be.

A similar analysis applies to the debtor's use of non-union supervisory personnel to do production work over the weekend of the 27th. The existing contract prohibits the debtor from doing so except in limited circumstances. This restriction is also one of the elements of the collective bargaining agreement that the debtor would like to modify by eliminating.

Debtor's actions in proceeding with layoffs and recalls and the use of supervisory personnel may or may not have been authorized by the existing contract. The implementation of the contract's seniority requirements is not strict and absolute. The rights given to a senior employee are subject to the requirement that it be qualified. "Qualified" in this instance is a function of the employee's "skill on work previously performed for the Company, job knowledge, attendance, and physical fitness." Exhibit "Z" par. 7.2. See also Exhibit "Z" sec. 7.6(b) (" 'Qualified' as used for purposes of this agreement shall mean the present ability of a capable, diligent, experienced operator who can perform the available work in accordance with the production standards or job requirements established by the company without job training or instruction.") It thus seems that under the contract as it exists, all other things being equal, preference is to be given to the senior employees.[2] Nonetheless, the determination of whether or not all other things are equal is a proposition which can be subject to endless debate and, at least to some extent, may involve a subjective analysis. The restriction on the use of supervisors for production work is also subject to some flexibility. The prohi-

---

1. The union makes an interesting argument that if the debtor's actions were permitted by the terms of the existing contract concerning layoffs, recalls, and production work there is no need to modify those provisions.

2. Even in the absence of contract provisions providing "for seniority rights on layoffs, it is contrary to generally accepted business practices to lay off the most senior men when all else is equal." *B.J. Provenzale Company, Inc.,* 1973 CCH NLRB Ph. 25,879 at 332,377.

bition is not absolute. Thus, whether or not one of the permissible exceptions would come into play is a debatable proposition.

The evidence the union introduced concerning layoffs and recalls establishes a prima facia case that the debtor failed to abide by the seniority requirements imposed upon it under the existing agreement, apparently in preference to the requirements of the agreement as it would like it to be. The evidence introduced concerning the use of supervisory personnel for production work does so as well. This required the debtor to come forward with evidence which would indicate that the criteria for determining whether or not an employee was qualified had been appropriately exercised, in light of the preference which is to be accorded to senior employees, and that one of the permissible exceptions concerning production work by supervisors applied.

> [O]nce it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him. *N.L.R.B. v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967) (emphasis original). *See also Barton Brands, Ltd. v. N.L.R.B.*, 529 F.2d 793, 802 (7th Cir.1976).

The debtor has not done so.

The only evidence presented concerning the propriety of the debtor's actions consists of testimony that it consulted with labor counsel before taking its action and was advised that it could permissibly implement the layoffs and recalls. There is no evidence concerning the manner in which the company determined whether or not any particular employee was qualified under the standards and factors established by the contract.[3] Without this evidence, in light of the manner in which recalls were implemented, the court cannot determine that the debtor acted in accordance with the existing contract.

The rationale or motivation for using supervisors for production work over the weekend is also unexplained—beyond the testimony that debtor relied upon the advice of its labor counsel before doing so. Although debtor's counsel argues that an "emergency" existed, the testimony of debtor's president fails to support this proposition or indicate what kind of emergency the debtor confronted. From the court's perspective, based upon the testimony at trial, the only "emergency" over the weekend of July 27 was the lack of any production employees due to the layoffs of the day before.

When a debtor seeks to reorganize its financial affairs and to reject a collective bargaining agreement, it is necessarily calling upon the equitable powers of the bankruptcy court, as those powers are constrained and guided by the Code and applicable Rules of Procedure. Nonetheless,

> When a debtor seeks protection from creditors, it is constrained to observe the letter and the spirit of such orders granting it protection and allowing it to operate until it seeks and obtains modification of such orders. *In re Prime, Inc.*, 26 B.R. 556, 560 (Bankr.W.D.Mo.1983).

The debtor failed to do so. Instead, it apparently elected to implement changes to the contract which were the subject of its proposal in the midst of the negotiating process. In doing so, it violated the explicit commandment of § 1113(f). When a debtor fails to abide by the restrictions which condition and limit its access to bankruptcy relief, it is hardly in a position to make a good faith plea for the court to exercise those powers in its favor. The court cannot find that debtor negotiated with the union in good faith.

---

**3.** Given the lack of consistency in implementing the recalls where seniority is concerned, it is apparent that the debtor's decision to recall any particular employee was based upon something other than an animus against senior employees. Accordingly, the court is not finding that the debtor violated the collective bargaining agreement. The court concludes only that, in the face of evidence indicating that it may have done so, the debtor failed to introduce evidence demonstrating a legitimate motivation or objective.

The union should take no comfort and can find no joy in the court's conclusion concerning the debtor's conduct. The union's own conduct is not above reproach. Indeed, it is subject to substantial criticism. It too failed to negotiate in good faith and it lacked good cause in refusing to accept the debtor's proposals. Nonetheless, in order to win rejection of a collective bargaining agreement, the court must be able to find that the debtor is without sin (the debtor "shall ... confer in good faith" 11 U.S.C. § 1113(b)(2)) and that the union is at fault (the union "has refused to accept such proposal without good cause" 11 U.S.C. § 1113(c)(2)). It is not a question of relative misconduct, in which the court may authorize rejection if it finds that debtor acted or conferred in better faith than the union. The debtor's obligation to confer in good faith is absolute and independent from questions involving the union's own misconduct. The union's failure to recognize its obligations does not authorize the debtor to ignore its own.

Just as the debtor failed to fulfill the obligations imposed upon it by § 1113 of the United States Bankruptcy Code, the union failed to fulfill its duties under the law. Its failure was immediate, beginning with the first meeting of June 27, and continued throughout the final negotiating session.

The union began by attempting to put an entire issue beyond the scope of modification and negotiation, by declaring that seniority was sacrosanct and nonnegotiable. As a matter of law, its position is clearly incorrect. Seniority rights are a proper subject for the proposed modification of a collective bargaining agreement and, if proposed, the issue must be negotiated. *Royal Composing Room*, 848 F.2d 345; *Garofalo's*, 117 B.R. 363. Indeed, the union is even obligated to negotiate with the debtor concerning proposals it believes to be illegal. *Mile Hi Metal Systems*, 899 F.2d at 891. Accordingly, by attempting to place an entire subject off limits, the union began its participation in the negotiating process improperly.

The union's improper attitude towards the subject of modification and its obligation to negotiate continued. Although its representatives did meet with the debtor on July 1, they refused to attend the meeting which had been agreed to for July 3. Having done so, they then steadfastly declined every invitation to schedule further meetings until it suited their convenience. Such an attitude is decidedly improper and intolerable. *See Carey Transportation*, 816 F.2d at 92; *Garofalo's*, 117 B.R. at 371; *In re Sierra Steel Corp.*, 88 B.R. 337, 341 (Bankr.D.Colo.1988); *K & B Mounting*, 50 B.R. at 468.

The professed need to rely upon the union's New York office to review the debtor's financial information, even if accurate, does not justify the union's stubborn refusal to meet.[4] Perhaps the best indication of the union's attitude towards the negotiating process was the unfair labor practice

---

**4.** Although the court is willing to accept the union's explanation that it had to rely upon the financial expertise of its the New York office in order to evaluate the debtor's proposal, it views the explanation with more than a small degree of skepticism. If the union were truly so totally dependent upon New York in order to participate in the negotiating process, this fails to explain the union "proposal" dated July 3 found on the production floor. Despite the debtor's repeated inquiries, the union refused to acknowledge its existence. Nonetheless, when the union finally did come to the negotiating table, that proposal was among those it submitted as a counter-proposal to those received from the debtor. It, thus, clearly appears that there were at least some issues that the union was able to consider and respond to without total reliance upon New York.

Accepting the accuracy of the union's explanation that it had to rely upon New York's financial expertise also leads to the conclusion that the union representative who assumed the exclusive responsibility for conducting the negotiations may not have been equal to the task. To commit the responsibility for negotiations concerning proposals and counter-proposals directed toward the debtor's financial well-being to a man who, by his own admission, is not even trusted to balance the family checkbook, hardly bodes well for meaningful discussions. It would seem to have limited his participation to little more than that of a messenger conveying information and responses between the debtor and New York.

charge it filed with the NLRB on July 8. The charge was premised, in part, upon the mere fact that the debtor had requested modifications to the contract and was levied *before* the union had made any effort to meaningfully discuss those modifications.

The union not only failed to negotiate in good faith with the debtor but it also lacked good cause for refusing to accept the debtor's proposed modifications to the contract. The need for modification is real and undisputed. The union does not challenge the debtor's need to generate the cost savings it seeks from bargaining unit employees. Neither does it deny that the debtor's proposal will generate the savings sought.

When negotiations are conducted pursuant to § 1113 of the Bankruptcy Code, the union is not permitted to simply refuse to accept a proposal. Instead, it must articulate the reasons it is unwilling to do so. *Carey Transportation*, 816 F.2d at 92; *Garofalo's*, 117 B.R. at 371. The union has failed to provide this articulation. It does, however, appear that its reasons are discernable. The first stems from a deeply held belief in the sacred nature of seniority. Although undoubtedly legitimate, by itself, such a belief is not necessarily a satisfactory reason for the refusal. *See Salt Creek*, 47 B.R. at 840–841. The second apparent reason for the union's unwillingness to accept appears to rest in its opinion that the counter-proposals it made to the debtor will attain the same goals the debtor seeks, but do less violence to its deeply held beliefs. While this might be a satisfactory reason if it were true, *Carey Transportation*, 816 F.2d at 92, the evidence indicates that it is not. In the first instance, the union attempted to improperly inject totally noneconomic issues into the negotiating process, through the preamble it requests. Including such a provision in the contract would have absolutely no impact upon the debtor's financial condition. While the union indicates that this lack of an economic impact should have caused the debtor to accept it, the court concludes that the lack of impact means it should never have been presented. If a debtor is not

permitted to inject noneconomic issues into the negotiation/modification process, *Mile Hi Metal Systems*, 899 F.2d at 893; *K & B Mounting*, 50 B.R. at 464, neither should the union.

The union's basic premise, that its proposals generate the same cost savings as those sought by the debtor, is faulty. It concedes that the calculations it used to arrive at those projected savings are faulty, because they do not include the anticipated overtime expenses that will result due to a diminished work force. Since that proposal would not generate the savings the debtor needed, it is no wonder the debtor was unable to accept it.

Despite the union's original indication that seniority was not negotiable, it retreated from that position and did propose a modification to the seniority provisions concerning layoffs and recall. While the proposal may indicate some flexibility on the part of the union, it does not appear as though it will fully accommodate the debtor's needs. Although it will permit the debtor to reduce its work force to the level desired, it fails to take into account the complexion of that work force. One of the debtor's goals for the layoffs is to retain the most talented, versatile, and efficient employees possible. These may or may not be the most senior. *See Royal Composing Room*, 848 F.2d at 350. The union's modified seniority proposal does not appear to give the debtor the flexibility it needs to accomplish this. In the first instance the maintenance department is entirely excluded from the modified seniority provision. Secondly, the proposal appears to automatically require the debtor to layoff employees with less than one year of seniority. This is an even more restrictive provision than the one contained in the current contract. Furthermore, although the requirement to layoff employees with less than one year of seniority, if viewed in a vacuum, may seem facially reasonable, under the facts of this case it is not. A review of the debtor's roster of employees indicate that only twenty-eight had more than one year of seniority as of the date of trial. Coincidentally, this number represents the initial target to which the debtor had hoped

to reduce its labor force. Accordingly, it seems that the union's layoff proposal is not only more restrictive than that contained in the current contract but that it would leave the debtor with no flexibility whatsoever in accomplishing layoffs in order to obtain the type of work force it needs for maximum efficiency and productivity.

Even though the union refused to negotiate with the debtor in good faith and lacked good cause for refusing to accept the debtor's proposed modifications to the contract, the court's inability to find that the debtor conferred in good faith prevents it from authorizing rejection of the collective bargaining agreement at the present time. The court does not, however, feel that this result should forever preclude the debtor from seeking modifications to the contract and, if they cannot be agreed upon, rejection, provided that all of the requirements of § 1113 have been fulfilled. The need for modification is real and undisputed. It is also immediate. Indeed, the union faces the very real possibility that it may soon have no jobs to negotiate over. If this is its desire, a perpetuation of its prior practices may very well accomplish it. Nonetheless, it would not seem that such a course of action would be in the best interests of its constituency.

It is the intent of this decision that the parties should once again return to the bargaining table in an effort to reach mutually satisfactory changes to the existing agreement. *See In re Cook United, Inc.,* 50 B.R. 561, 564 (Bankr.N.D.Ohio 1985). If they are unable to do so, the debtor may file a second motion to reject at the end of thirty days. *See In re Indiana Grocery Co., Inc.,* No. IP 89–4498 RAV, slip op. at 31 (Bankr.S.D.Ind. February 5, 1990).

An appropriate order will be entered.