## In re SCHAUER MANUFACTURING CORPORATION, Debtor.

### Bankruptcy No. 1–92–02872.

United States Bankruptcy Court, S.D. Ohio, W.D.

Aug. 7, 1992.

Eric C. Okerson, Cincinnati, Ohio, for debtor.

James B. Robinson, Cincinnati, Ohio, for union.

Edmund J. Adams, Cincinnati, Ohio, for unsecured creditors' committee.

Charles Caldwell, Cincinnati, Ohio, Asst. U.S. Trustee.

## DECISION ON § 1113 APPLICATION

BURTON PERLMAN, Chief Judge.

Debtor filed a Chapter 11 case and has now filed Application of Debtor and Debtor-in-possession for Order Authorizing Rejection of Debtor's Collective Bargaining Agreement, pursuant to 11 U.S.C. § 1113.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A) and (O).

The Application was filed July 17, 1992. Hearing thereon began on July 31, 1992. The facts are as follows. Debtor manufactures and sells battery chargers and associated items. Debtor entered into a collective bargaining agreement ("the Agreement") with the International Association of Machinists and Aerospace Workers ("Union"). The Agreement was effective August 28, 1991 and by its terms expires August 27, 1994. The management of debtor is now in the hands of a turnaround consultant, American Operations Management. The individual from American Operations Management who now directs the operation of debtor is Edward Buyniski. Preceding the filing of the Application a meeting was held on June 17, 1992 attended by representatives of current management and of the Union. At that meeting, management handed to the Union representatives a document (hereafter "the Proposal") which in its entirety stated:

Requested Changes to Labor Agreement Between Schauer Manufacturing & International Assoc. of Machinists and Aerospace Workers

*Relating to Contract:*

1. Ability to assign workers based on the needs of the company at the sole discretion of management. We will agree that we must reassign individuals back to their job classification within three months.

2. Ability to hire new employees at entry level scale rather than recalling laid off workers. (Company choice)

Should future lay off be necessary, we will lay off by seniority of the, then employed, workforce. Probationary period extended to 90 days.

3. Withdrawal from present pension plan. A new plan will be reinstated and included in our plan for reorganization. (ART XXIII)

4. Hospitalization insurance will be acquired. Removal of the benefit levels specified in the contract. We will get the best coverage which our financial condition allows. It may be necessary to ask individuals to subsidize part of the cost. The plan will be identical for EVERY employee of Schauer. (ART XXIV)

5. No restriction on management and supervisors performing direct labor. (ART XX)

*Non specified in the contract:*

1. Revert to one lunch and break schedule.

2. Vacation requests are awarded on a combination of when the request is made and seniority. They should be scheduled further in advance and can only be granted within the needs of the company.

At the end of the July 17, 1992 meeting, a date of July 22, 1992 was selected for another meeting, and a further meeting was held at that time. The July 22 meeting consumed a large part of the afternoon of that day, but only about half an hour was devoted to discussion of the Proposal, while the balance dealt with pending grievances. With respect to the first item of the Proposal, it was the position of the Union that it saw no need to modify the existing Agreement because management already had the power there sought. As to the second item, it was the position of the Union that it represented laid off workers as well as those presently working, and could not agree to this proposal. In addition, the Union representatives expressed the view that the use of more experienced workers was more beneficial to the debtor than new workers. The third item is a proposed withdrawal from the present pension plan, which is provided for in the exist-

ing Agreement. The Union representatives rejected this proposal.

The fourth item dealt with hospitalization insurance. The debtor is presently self-insured with respect to hospitalization. This has resulted in the unfortunate circumstance that claims by employees have not been paid by the debtor. Both parties, management and the Union, are interested in revising the provision of the Agreement in this respect to obtain coverage for employees by an outside health insurance carrier. At the hearing, management withdrew this item from consideration by the court because it is the subject of ongoing discussions between the parties.

With respect to item 5, again it was the position of the Union that the Agreement already contained provision for governing the performance of the direct labor by supervisors, and no need for modification. could be perceived.

There are two last items in the document which was handed to Union representatives at the June 17, 1992 meeting. These are headed "Non specified in the contract". While there was some discussion of these two items at the hearing, it was generally agreed that these were not matters which entered into the present consideration by the court.

With respect to the first five items submitted to the Union by management (Item 4 being withdrawn), it is true that the Union took the position that modification of the Agreement was not acceptable, in the case of Items 1 and 5, the Union asserting that existing contract provisions were adequate to protect the interests of debtor.

At the hearing, Buyniski testified that it was his strategy to reorganize the debtor by downsizing it, keeping profitable customers, and reducing expenses. He testified that his goals were to maintain sales at about $4 million, and to reduce fixed costs to $1.3 million. When he arrived, fixed costs were about $2 million, and now they are about $1.4 million. He defined contribution margin as what is available to pay fixed costs, and is a ratio derived by a fraction in which cost is the numerator and revenue is the denominator. When he ar-

rived, the contribution margin was at 22%. He said that if there were $4 million in sales and a 37% contribution margin, the company would about break even. He testified that the cost of direct labor is one of the elements in the numerator in contribution margin. It was his testimony, further, that it was his objective with the proposals submitted to the Union to reduce labor costs by $150,000.00. He testified that implementation of the first item would save $60,000.00 and of the second $62,400.00. Elimination of the pension plan, Item 3, would save $49,000.00. As to the last item, the fifth, he estimated $10,000.00 in savings, although this was admittedly speculative.

We make reference to other testimony which emerged at the hearing which was undisputed and bears on the question before us. Juanita Parsons is a member of the Union who serves as chairman of a shop committee. She had been involved in the negotiations of. the last collective bargaining agreement. She testified that what had happened was that the company had made a proposal to which the Union offered a counter proposal. There then followed negotiations and the parties reached agreement.

The pertinent statute, so far as here relevant, states:

**11 USCS § 1113. Rejection of collective bargaining agreements**

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter [11 U.S.C.S. § 1101 et seq.], other than a trustee in a case covered by subchapter IV of this chapter [11 U.S.C.S. § 1161 et seq.] and by title I of the Railway Labor Act [45 U.S.C.S. § 151 et seq.], may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

*   *   *   *   *   *

After due consideration, we have reached the conclusion that the present application should fail because, in the language of § 1113(c), debtor has not "made a proposal that fulfills the requirements of subsection (b)(1)." More specifically, debtor has failed to show that the Proposal which it made to the Union makes "necessary modifications ... that are necessary to permit the reorganization of the debtor ...," and, further, has failed to provide the Union with relevant information necessary to evaluate the Proposal. Key to this conclusion is the fact that not until debtor filed its present motion was the Union informed that it was the objective of management to achieve savings of $150,000.00, and it was not until the hearing that management made it known to the Union what the reorganization strategy of the retained turnaround consultant was, and the financial goals necessary in order to implement that strategy.

Before the Union can be expected to respond or make a counter proposal to specific proposals by management, it is entitled to know what the objectives of management are. That is, the financial objectives of management must be disclosed to the Union so that the Union can evaluate the validity of the position of management that that financial objective is what is necessary to achieve a successful reorganization of the debtor. (Those objectives require some study, for Buyniski testified that it was his objective to reduce direct expenses from $1.4 million to $1.3 million, i.e. by $100,-000.00, yet he at the hearing testified that the Proposal would save some $150,000.00.)

Assuming that the Union agrees with the magnitude of necessary savings, fairness requires that the Union then be given an opportunity to counter propose savings in areas other than those specified by management in the Proposal which was here made by management. Only after the Union is given knowledge of the goals in question, has an opportunity to evaluate the reasonableness of those goals, and has the further opportunity to look at the specific proposals advanced by management with those goals in mind, or to propose its own solution to the problem, can it be said that there is not good cause for the Union to refuse to accept management's proposals. *See In re George Cindrich General Contracting, Inc.,* 130 B.R. 20, 23–24 (Bankr.W.D.Pa.1991); *In re K & B Mounting, Inc.,* 50 B.R. 460, 467–68 (Bankr. N.D.Ind.1985).

The Application will be denied.